Harmeet K. Dhillon (SBN 207873)
Harmeet@DhillonLaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
Telephone: (415) 433-1700

Mark Trammell*
MTrammell@LibertyCenter.org
Joshua W. Dixon*
JDixon@LibertyCenter.org
Eric A. Sell*
ESell@LibertyCenter.org
CENTER FOR AMERICAN LIBERTY
1311 South Main Street, Suite 302
Mount Airy, MD 21771
Telephone: (703) 687-6200

*Attorneys for Plaintiff*
**Pro Hac Vice* Motions Forthcoming*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AURORA REGINO, | Case No._____ |
| Plaintiff, | |
| v. | VERIFIED COMPLAINT |
| | Jury Trial Demanded |
| SUPERINTENDENT KELLY STALEY, in her official capacity; CAITLIN DALBY, in her official capacity; REBECCA KONKIN, in her official capacity; TOM LANDO, in his official capacity; EILEEN ROBINSON, in her official capacity; and MATT TENNIS, in his official capacity, | |
| Defendants. | |

Plaintiff, Aurora Regino, by and through her undersigned counsel, states the following claims for relief against Defendants, each in their official capacity only, and respectfully requests that this Court render a declaratory judgment and preliminary and permanent injunction against Defendants' ongoing violations of the United States Constitution as set forth herein. In support of her claims, Ms. Regino states as follows:

## INTRODUCTION

1.      The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects parents' fundamental right to direct the upbringing of their children. This protection includes parents' right to be involved in the decision-making process when a public school decides to socially transition their children from one gender to another.[1] Social transitioning is a powerful psychological intervention affecting a matter of major importance to a child's life—namely, his or her gender identity. Absent a compelling state interest, which is not present here, public schools may not socially transition children without first informing and receiving consent from their parents.

2.      Like many public-school districts in California, the Chico Unified School District (the "District") has adopted a policy (the "Parental Secrecy Policy" or the "Policy") under which schools in the District will (1) socially transition students who

---

[1] "Social transitioning" refers to the active affirmation of a transgender identity. *See* Affidavit of Dr. Stephen B. Levine, dated January 5, 2023 ("Levine Affidavit") ¶ 12f, attached hereto as Exhibit A. In children, it includes things like calling the child by a new name associated with their new gender, referring to the child by pronouns associated with their new gender, and allowing the child to use public bathrooms associated with their new gender. *Id.*

express a desire to live as a gender different from that associated with their biological sex while (2) keeping the social transitioning secret from their parents unless the student specifically authorizes the school to inform them. Under the Parental Secrecy Policy, schools in the District are prompting students to question their sexuality and gender, facilitating their social transition to a new gender identity, and integrating this new person into the school ecosystem, all without informing or receiving consent from their parents. Even if the parents would be supportive of their children—as Ms. Regino was here—the Parental Secrecy Policy precludes parents from being a part of this significant and formative event in their children's lives.

3.     Ms. Regino's oldest daughter, A.S., was a fifth-grade student at an elementary school operated by the District during the 2021–2022 school year. In early 2022, when A.S. was eleven years old, she informed a school counselor that she "felt like a boy." Within minutes of A.S. making that statement, the counselor encouraged A.S. to adopt a male identity, which included using a male name and male pronouns. After the meeting, the counselor walked A.S. back to class and informed A.S.'s teacher about A.S.'s new identity. Over the following months, the District used A.S.'s male name and pronouns while at school, and the school counselor provided A.S. with additional information about continuing her transition to a male identity. All of this was kept hidden from A.S.'s mother.

4.     After several weeks of A.S. identifying as a boy at school, Ms. Regino learned about A.S.'s new gender identity. Ms. Regino was supportive of A.S. but upset that the school had not even informed her that it was socially transitioning her

daughter from a girl to a boy. She tried to encourage the District to abandon the Parental Secrecy Policy in favor of a policy that would involve parents in students' gender transitions, but she was told that the Policy was required by California law. This is false.

5.    Despite the District's efforts to socially transition A.S. to a boy, she has, for now, returned to identifying as a girl. She believes her feelings of gender confusion were brought on by the stress of other difficulties in her life. She attends regular counseling sessions with a private therapist to help her to cope with these stressors.

6.    By socially transitioning A.S. without informing Ms. Regino or obtaining her consent, the District violated Ms. Regino's fundamental right to direct the upbringing of her child. Parents, not schools, have the right and responsibility to make major life decisions on behalf of their minor children. That right is infringed when schools socially transition children from one gender to another without involving their parents.

7.    Ms. Regino brings this action to vindicate that right. Both of her children still attend school in the District, and the District continues to adhere to the Parental Secrecy Policy. Accordingly, Ms. Regino's parental rights are subject to an ongoing threat. She seeks (1) a declaratory judgment declaring the Parental Secrecy Policy unconstitutional and (2) a preliminary and permanent injunction precluding the District from continuing to enforce the Policy.

## JURISDICTION AND VENUE

8.    This action arises under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, and 28 U.S.C. §§ 2201 and 2202.

9.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1331.

10.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Ms. Regino's claims occurred within the Eastern District of California.

THE PARTIES

11.    Plaintiff Aurora Regino is a resident of Chico, California. She is a single mother with sole custody over her two minor daughters, A.S. and C.S., both of whom live with her. At all relevant times to this Complaint, both A.S. and C.S attended— and still attend—schools operated by the District. Ms. Regino is a fit parent, is actively involved in her children's lives, loves her children dearly, seeks to do what is best for them, and wishes to provide them with the nurturing and guidance of a loving and caring mother in all aspects of their lives. To that end, Ms. Regino engages with her children's schools to ensure that she is informed about what occurs in their lives when they are not at home. She intends to continue this level of involvement in her children's lives.

12.    The District is a public school district based in Chico, California. It operates twenty-three schools—twelve elementary schools, four junior high schools, three high schools, and four other schools. *See* http://www.chicousd.org/Schools/Our-Schools/index.html, last visited on January 5, 2023, attached hereto as Exhibit B. Over 12,000 students attend school in the District. *See* http://www.chicousd.org/Our-District/index.html, last visited on January 5, 2023, attached hereto as Exhibit C.

13.    The District is governed by the Chico Unified School District Board of Education (the "Board"). *See* http://www.chicousd.org/Our-District/Board-Trustee-

1   Information/index.html, last visited on January 5, 2023, attached hereto as Exhibit

2   D. The Board and its five Members are responsible for oversight, operations, and

3   policy, which includes but is not limited to the Parental Secrecy Policy. *See id.*

4       14.    Defendant Caitlin Dalby is a Member of the Board. *See id.* In this

5   capacity, Ms. Dalby is responsible for oversight, operations, and policy, including but

6   not limited to the Parental Secrecy Policy, at the schools within the District. *See id.*

7   At all times relevant to this Complaint, Ms. Dalby was and will be acting under color

8   of California law while performing her duties as a Board Member. Ms. Dalby is sued

9   in her official capacity only.

10       15.    Defendant Rebecca Konkin is a Member of the Board. *See id.* In this

11   capacity, Ms. Konkin is responsible for oversight, operations, and policy, including

12   but not limited to the Parental Secrecy Policy, at the schools within the District. *See*

13   *id.* At all times relevant to this Complaint, Ms. Konkin was and will be acting under

14   color of California law while performing her duties as a Board Member. Ms. Konkin

15   is sued in her official capacity only.

16       16.    Defendant Tom Lando is a Member of the Board. *See id.* In this capacity,

17   Mr. Lando is responsible for oversight, operations, and policy, including but not

18   limited to the Parental Secrecy Policy, at the schools within the District. *See id.* At

19   all times relevant to this Complaint, Mr. Lando was and will be acting under color of

20   California law while performing his duties as a Board Members. Mr. Lando is sued

21   in his official capacity only.

22       17.    Defendant Eileen Robinson is a Member of the Board. *See id.* In this

capacity, Ms. Robinson is responsible for oversight, operations, and policy, including but not limited to the Parental Secrecy Policy, at the schools within the District. *See id.* At all times relevant to this Complaint, Ms. Robinson was and will be acting under color of California law while performing her duties as a Board Member. Ms. Robinson is sued in her official capacity only.

18.     Defendant Matt Tennis is a Member of the Board. *See id.* In this capacity, Mr. Tennis is responsible for oversight, operations, and policy, including but not limited to the Parental Secrecy Policy, at the schools within the District. *See id.* At all times relevant to this Complaint, Mr. Tennis was and will be acting under color of California law while performing his duties as a Board Member. Mr. Tennis is sued in his official capacity only.

19.     Defendant Kelly Staley is the Superintendent of the District. *See* http://www.chicousd.org/Our-District/Superintendent/index.html, last visited on January 5, 2023, attached hereto as Exhibit E. In this capacity, Ms. Staley is responsible for overseeing the implementation of all District policies, including the Parental Secrecy Policy, and she has ultimate supervisory authority over all District employees, which includes all employees working at the schools within the District. At all times relevant to this Complaint, Ms. Staley and was and will be acting under color of California law while performing her duties as Superintendent. Ms. Staley is sued in her official capacity only.

## FACTUAL ALLEGATIONS

**The Parental Secrecy Policy**

20.    The District has adopted and implemented the Parental Secrecy Policy. Under this Policy, which is a policy, practice, procedure, and / or custom of the District, schools will (1) socially transition students who express a desire to live as a gender different from that associated with their biological sex while (2) keeping the social transitioning secret from their parents unless the student specifically authorizes the school to inform them.  On information and belief, for the reasons set forth in Paragraph 53, the District applies the Parental Secrecy Policy at all schools within the District.

21.    Under the Policy, schools accomplish social transitioning of students by, among other things, referring to students by a new name associated with their new gender, referring to students by pronouns associated with their new gender, and allowing students to use bathrooms associated with their new gender.

**A.S. Joins Ms. Robinson's "Girls Group" at Sierra View**

22.    Ms. Regino's oldest daughter, A.S., is a twelve-year-old biological female. She is currently in sixth grade at Marsh Junior High ("Marsh"), one of the junior high schools in the District. During the 2021–2022 school year, A.S. attended fifth grade at Sierra View Elementary School ("Sierra View"), which is also in the District.

23.    In the fall of 2021, A.S. began feeling depressed and anxious. She had just begun puberty, and there had been significant changes in her home life over the preceding months. Her grandfather had recently passed away and her mother (Ms.

Regino) had just completed treatment for breast cancer and was in the process of obtaining a degree in nursing. A.S.'s father is disabled due to an injury from an automobile accident and, as a result of the changes at home, A.S. began taking on a greater role in caring for her younger sister, C.S., who was seven years old at the time. The confluence of these events left A.S. feeling mentally exhausted and emotionally confused.

24.     Mandi Robertson was a school counselor at Sierra View. Throughout the 2021–2022 school year, Ms. Robertson regularly visited A.S.'s class to remind them of the services the counselor's office provides.

25.     One topic that Ms. Robertson regularly raised with the students was sexuality and gender identity. She would encourage students to explore their identity and consider whether they felt like they were not the gender associated with their biological sex. She explained that such feelings were normal and that students should embrace them.

26.     A.S. took Ms. Robertson's advice. She wondered if her new feelings of anxiety and depression were because she was born the wrong gender. Around December 2021, A.S. began feeling like she might be a boy. These feelings were the result of her exploring her identity consistent with Ms. Robertson's instructions.

27.     In December 2021, before winter break, A.S. met with Ms. Robertson to discuss her feelings. At that meeting, A.S. did not mention that she felt like a boy. Ms. Robertson encouraged A.S. to join a small group of other girls around her age that she (Ms. Robertson) organized when school resumed the following month (the

"Girls Group"). Ms. Robertson told A.S. that the group was primarily focused on arts and crafts, and that the group would be a good opportunity for A.S. to make new friends. Ms. Robertson provided A.S. with a permission slip for participation in the Girls Group to take home for her mother to sign.

28.     Ms. Regino agreed that an arts-and-crafts group would facilitate positive social interaction for A.S. with other girls her own age and could help A.S. with her anxiety and depression. Ms. Regino approved of her daughter joining the Girls Group and signed the permission slip allowing A.S. to participate in the group once school began in the spring semester of 2022. The permission slip was for attendance at the Girls Group only, and *not* for one-on-meetings with Ms. Robertson.

29.     On or about January 20, 2022, A.S. attended her first Girls Group meeting. The meetings included A.S. and about four of her female classmates, whose ages ranged from 10 to 12 years old. The first one or two meetings of the Girls Group were geared towards arts and crafts, as A.S. anticipated, but the subject of the meetings quickly changed.

**Ms. Robertson and the District Socially Transition A.S.**

30.     After one or two Girl's Group meetings, A.S. went to Ms. Robertson's office to tell her that she "felt like a boy" or words of similar effect. Ms. Robertson asked A.S. if she had a boy's name that she would like to be called and whether she would like to be referred to by male pronouns. A.S. was unsure whether she wanted others at school to start calling her by a male name and pronouns, but she felt pressured by Ms. Robertson, so she responded in the affirmative and told Ms.

Robertson her boy's name was "J.S." During this meeting, Ms. Robertson did not discuss A.S.'s feelings of anxiety and depression. Instead, the discussion focused solely on how to effect A.S.'s social transition to a boy.

31.    After the meeting, Ms. Robertson walked A.S. back to her classroom and told her teacher that A.S. was now going by the name "J.S." and male pronouns, and her teacher immediately began referring to her as such. Soon thereafter, other teachers and school employees also began referring to A.S. by "J.S." and male pronouns. A.S. did not fully understand what was happening, and she never authorized—or wanted—any District personnel other than Ms. Robertson or her teacher to refer to her by "J.S." or male pronouns.

32.    Once A.S. "came out" to Ms. Robertson, the Girls Group meetings changed substantially. Instead of arts-and-craft projects, Ms. Robertson now led A.S. and her female classmates in a discussion regarding sexuality and gender identity. They discussed how to cope with feeling like a different gender—specifically, how embracing these feelings and transitioning can alleviate the pain and anxiety of living as the wrong gender.

33.    Over the course of the spring semester of 2022, A.S. had two additional one-on-one meetings with Ms. Robertson. At these meetings, Ms. Robertson provided A.S. with additional resources regarding her new male identity, such as referring A.S. to a local community group that advocates for LGBTQ+ causes and discussing "breast binding" with her.[2] A.S. told Ms. Robertson that she wanted to tell her mother about

---

[2] "Breast binding" is the flattening of a biological female's breasts with constrictive clothing to make the chest appear flat.

her new identity, but Ms. Robertson was not supportive of this course of action. She brushed off A.S.'s request and encouraged her to speak with other family members first. At no time did Ms. Robertson suggest A.S. should discuss her feelings with a mental health professional.

34.     During this time, school personnel continued referring to A.S. by her new name and pronouns. Every day at school, A.S. was known as "J.S." and referred to with male pronouns, while at home, she remained A.S. Despite requiring a parental permission slip for A.S. to participate in an arts-and-crafts club, the District socially transitioned A.S. from a girl to a boy without even *informing* her mother, much less obtaining her permission to do so.

**A.S. "Comes Out" to her Grandmother but Returns to her Female Identity**

35.     On or about April 8, 2022, A.S. told her grandmother about her new identity. A.S.'s grandmother informed Ms. Regino of the news later that day.

36.     Ms. Regino was surprised to learn of A.S.'s transition, and she was shocked that the District had socially transitioned A.S. without involving her, but she was—and is—supportive of her daughter. All she wanted—and wants—was for her daughter to be happy and healthy in whatever identity she chooses. Ms. Regino informed A.S. of her support and told her she would assist her with her transition if that was what she wanted. In addition, Ms. Regino arranged for A.S. to begin attending counseling sessions with a licensed marriage and family therapist to discuss her feelings of depression and anxiety.

37.     Although Ms. Regino was supportive of her daughter, had Ms. Regino

been involved in the process, she would not have allowed Sierra View to socially transition her daughter without first seeking guidance from a mental health professional. Ms. Regino arrived at this view for several reasons, including but not limited to: A.S.'s young age; the quick onset of A.S.'s feelings of gender confusion; the fact that those feelings appeared to have originated with Ms. Robertson, not A.S.; the existence of other stressors in A.S.'s life that could potentially explain her feelings of gender confusion; and the short duration of A.S.'s feelings of gender confusion.

38.   Even before A.S. "came out" to her grandmother, she had already begun to question whether she really felt like a boy or wanted to use her male name and male pronouns. But because the Sierra View community now viewed her as a boy, called her by a male name, and referred to her using male pronouns, A.S. felt like she was stuck in the new identity, which she inhabited for the remainder of her fifth-grade year. Her depression and anxiety worsened to the point where she wanted to transfer to a different school.

39.   Over the rest of the spring semester and summer of 2022, A.S.'s feelings about being a boy continued to desist.

40.   A.S. was slated to begin sixth grade at Marsh Junior High School ("Marsh"), another school within the District, for the 2022–2023 school year. In addition, C.S. was slated to begin third grade at Sierra View for the 2022–2023 school year.

41.   By the beginning of the 2022–2023 school year, A.S. began identifying as a girl again. While she continues to identify as a girl, she is still in counseling for

1    her depression and anxiety.

2    **Ms. Regino Tries to Persuade the District to Abandon the Policy**

3        42.    Soon after learning that the District had socially transitioned A.S. and

4    kept it a secret from her, Ms. Regino had several telephone calls, in-person meetings,

5    and email exchanges with District personnel in which she expressed her concerns

6    about the District's actions.

7        43.    In April of 2022, The District's Director of Elementary Education, Ted

8    Sullivan, informed Ms. Regino that California law required schools to socially

9    transition students without informing their parents unless the student authorizes

10   them to do so.

11       44.    In addition, Mr. Sullivan emailed Ms. Regino a link to an "FAQ" page on

12   the California Department of Education ("DOE") website regarding Assembly Bill

13   1266 ("AB 1266"). *See* https://www.cde.ca.gov/re/di/eo/faqs.asp, last visited on

14   January 5, 2023, attached hereto as Exhibit F, the entirety of which is expressly

15   incorporated by reference under Rule 10(c) of the Federal Rules of Civil Procedure as

16   if stated verbatim herein. AB 1266 was legislation, now codified at Cal. Ed. Code. §

17   221.5, designed to prohibit discrimination in schools based on gender identity.

18       45.    On the FAQ page, the California DOE set forth guidance to "assist school

19   districts with understanding and implementing policy changes related to AB 1266."

20   *Id.* The guidance states that, when a transgender student "so chooses, [school]

21   personnel *shall be required to address the student by a name and the pronouns*

22   *consistent with the student's gender identity*, without the necessity of legal

23

documentation or a change to the student's official district record." *Id.* (emphasis added). It further provides that "schools must consult with [the] transgender student to determine who can or will be informed of the student's transgender status, *if anyone, including the student's family." Id.* (emphasis added). And it provides that "with rare exceptions, schools are required to respect the limitations that a student places on the disclosure of their transgender status, *including not sharing that information with the student's parents." Id.* (emphasis added).

46.    Mr. Sullivan informed Ms. Regino that, based on this guidance, the Parental Secrecy Policy was required by California law.

47.    The guidance, however, does not purport to have the force of law, nor does AB 1266 (or any other provision of California law) require schools to adopt the Parental Secrecy Policy. Instead, as relevant here, AB 1266 provides only that California public schools must allow students to "participate in sex-segregated school programs and activities . . . and use facilities consistent with his or her gender identity." *See* Calif. Educ. Code § 221.5(f). Moreover, even if California law required schools to adopt the Parental Secrecy Policy (and it does not), such law would be in violation of parents' fundamental right to direct the upbringing of their children.

48.    As the 2021–2022 school year came to a close, Ms. Regino became concerned that (1) District employees at Marsh could attempt to socially transition A.S. without informing her, like they had done at Sierra View, and (2) District employees at Sierra View could also attempt to transition C.S. without her knowledge, as they had done with her sister. Disappointed by her exchange with Mr.

Sullivan, Ms. Regino reached out to other District administrators in an effort to convince them that the District should not follow the Parental Secrecy Policy any longer.

49.     On or about May 5, 2022, Ms. Regino met with the District's Deputy Superintendent, Jay Marchant. Mr. Marchant, like Mr. Sullivan, informed Ms. Regino that the Parental Secrecy Policy was required by California law.

50.     On or about August 9, 2022, Ms. Regino again met with Mr. Marchant, this time to seek to transfer her younger daughter, C.S., out of Sierra View and into a different school within the District, away from Ms. Robertson. On or about August 22, 2022, the District granted Ms. Regino's request, authorizing C.S. to transfer to Parkview, another school within the District.

51.     Ms. Regino continued to press District administration for assurances that it would no longer enforce the Parental Secrecy Policy. On or about October 10, 2022, Ms. Regino met with the District's Superintendent, Kelly Staley, to discuss the issue. In that meeting, Ms. Staley, like Mr. Sullivan and Mr. Marchant, informed Ms. Regino that the Parental Secrecy Policy was required by California law.

52.     On October 31, 2022, Ms. Regino emailed Superintendent Staley to reiterate her concerns with the Parental Secrecy Policy. On or about November 2, 2022, in response to Ms. Regino's follow-up email, Ms. Staley confirmed that the District would continue to apply the Parental Secrecy Policy at its schools, informing Ms. Regino that the District "must work within the confines of the law."

53.     On information and belief, the District applies the Parental Secrecy

Policy, which includes all of terms listed on the California DOE's guidance document (Exhibit F), at all of its schools, including but not limited to Marsh and Parkview. While Ms. Regino does not have first-hand knowledge of these facts, these allegations are based on the facts that: (1) the California DOE asserts that the provisions of Exhibit F are required by AB 1266; (2) Mr. Sullivan emailed Ms. Regino a link to Exhibit F in response to her questions about the Policy; and (3) Ms. Staley, Mr. Marchant, and Mr. Sullivan all informed Ms. Regino that it was their belief that California public schools were required to enforce the Parental Secrecy Policy, a conclusion that would apply to all of the schools in the District. Based on this fact, the only reasonable conclusion is that the Parental Secrecy Policy, as set forth in Exhibit F, applies at all of the schools in the District, including but not limited to Marsh and Parkview, where Ms. Regino's daughters now attend.

**The Threat to Ms. Regino's Rights is Ongoing**

54.     Ms. Regino respects her daughters' life choices and will be supportive of them no matter what those choices ultimately may be. Ms. Regino simply wants to be involved in her daughters' lives and with choices that have fundamental importance to them, such as choices regarding their gender identity. Because the District applies the Parental Secrecy Policy at the schools Ms. Regino's daughters attend, the Policy presents a real, imminent, and credible threat to her parental right to direct their upbringing insofar as it operates to keep decisions regarding her children's changed gender identities secret from her and allows such decisions to be made without her involvement. Given the quick onset of A.S.'s prior episode of gender

confusion, the continuing existence of stressors in her life, and her ongoing anxiety and depression, the reoccurrence of her prior feelings could happen at any time. Moreover, the same confusion could appear in C.S. at any time, especially considering the two girls' consanguinity and similar life experiences. Further, the District refused to disavow the Parental Secrecy Policy and, by definition, that Policy requires District employees to hide information from parents, thus disrupting one of the primary channels of parental knowledge about their children—namely, their schools. For this reason, Ms. Regino is subject to a real, imminent, and realistic danger that the Parental Secrecy Policy will (again) deprive her of the ability to be involved in the fundamental decisions in her children's lives.

55.     So long as the Parental Secrecy Policy (or a similar policy) is in place, Ms. Regino faces the constant threat of constitutional harm.

CAUSES OF ACTION
COUNT ONE
Facial Challenge to Parental Secrecy Policy
Under 42 U.S.C. § 1983
Substantive Due Process

56.     Ms. Regino hereby incorporates by reference all other paragraphs of this Complaint as though fully set forth herein.

57.     The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects the fundamental rights of parents to direct the upbringing of their children; to make decisions concerning the care, custody, and control of their children; to direct the medical and mental health decision-making for their children; and to make private familial decisions regarding their children without undue interference by the state. These fundamental rights are deeply rooted

in our nation's history and tradition and implicit in the concept of ordered liberty.

58.    On its face, the Parental Secrecy Policy violated in the past—and threatens to violate in the future—Ms. Regino's fundamental right to direct the upbringing of her children; to make decisions concerning the care, custody, and control of her children; to direct the medical and mental health decision-making for her children; and to make private familial decisions regarding her children without undue interference by the state.

59.    The Parental Secrecy Policy violated—and threatens to violate—Ms. Regino's rights in the following ways, as explained in more detail in the Levine Affidavit (Exhibit A), the entirety of which is expressly incorporated by reference under Rule 10(c) of the Federal Rules of Civil Procedure as if stated verbatim herein:

a.    The Parental Secrecy Policy authorizes children to make mature, consequential, private, and potentially life-altering decisions without parental knowledge or consent by excluding parents from the decision-making process on these matters;

b.    The Parental Secrecy Policy takes from parents and arrogates to District personnel the authority to make these consequential, private, and potentially life-altering decisions for their children by excluding parents from the decision-making process and placing decision-making authority in District personnel;

c.    The Parental Secrecy Policy takes from parents the authority to make these consequential, private, and potentially life-altering

decisions for their children by excluding parents from the decision-making process and placing decision-making authority in their children;

d.   The Parental Secrecy Policy assumes that parents are not fit parents, capable of making decisions on behalf of their children, which both (1) violates the constitutionally mandated presumptions of fitness and affection unless proven otherwise and (2) impermissibly sows seeds of doubt in children's mind about whether their parents are acting in their best interests, thus creating a rift in the parent-child relationship;

e.   The Parental Secrecy Policy usurps parents' responsibility as the ultimate decision-maker regarding their children's mental health and well-being, including but not limited to decisions related to their gender identity and expression, and assigns that responsibility to the District;

f.   The Parental Secrecy Policy conceals important information from parents about their children's mental health and well-being, thus precluding them from taking actions that they would deem in their children's best interests if they were provided with the relevant information;

g.   The Parental Secrecy Policy authorizes the District to engage in significant psychological treatment of children, in the form of

socially transitioning them to a new gender, without parents' knowledge or consent. When the District socially transitions a student, it is engaging in medical treatment of the child without parents' knowledge or consent;

h.   The Parental Secrecy Policy results in the District providing substandard psychological treatment of children because parental involvement—and their deep knowledge of their children over their life course, family interactions, and extra-circular environment—is crucial in their diagnosis, assessment, and treatment;

i.   The Parental Secrecy Policy results in the District providing substandard psychological treatment of children because it assumes that immediate and unqualified affirmation is the only permissible response to a child exhibiting gender confusion whereas, in reality, such a "one size fits all" approach to these issues is a blunt instrument that fails to account for the unique facts involved in each situation;

j.   The Parental Secrecy Policy results in the District providing substandard psychological treatment of children because District personnel are not trained mental health practitioners in the field and thus are not qualified to provide students expressing gender confusion the care they need;

1            k.     The Parental Secrecy Policy results in the District providing

2                 substandard psychological treatment of children because

3                 creating a situation where a child performs different gender

4                 identities and roles at home and school is inherently

5                 psychologically unhealthy for the child; and

6            l.     The Parental Secrecy Policy results in the District providing

7                 unconsented-to psychological treatment because: (1) children are

8                 cognitively incapable of giving informed consent to life-altering

9                 psychological interventions like social transitioning and the

10                more-drastic gender-affirming care that is likely to follow; (2)

11                District personnel do not have sufficient knowledge of the

12                complexities and risks inherent in the field to provide students

13                sufficient information that they could provide informed consent

14                even if they were cognitively capable of doing so; and (3) District

15                personnel do not have sufficient knowledge of the complexities

16                and risks inherent in the field to themselves evaluate whether

17                social transitioning is appropriate and ethical treatment.

18      60.    The Parental Secrecy Policy is not narrowly tailored to any compelling

19  governmental purpose, does not further any important government purpose, and is

20  not supported by any rational basis.

21      61.    Ms. Regino has no adequate remedy at law for these deprivations and

22  will suffer serious and irreparable harm to her constitutional rights unless

23

Defendants are enjoined as set forth herein.

62.     Ms. Regino is entitled to declaratory relief and preliminary and permanent injunctive relief invalidating and restraining Defendants from their ongoing violations of her constitutional rights as set forth herein.

**COUNT TWO**
As-Applied Challenge to Parental Secrecy Policy
Under 42 U.S.C. § 1983
Substantive Due Process

63.     Ms. Regino hereby incorporates by reference all other paragraphs of this Complaint as though fully set forth herein, including but not limited to the Levine Affidavit.

64.     Defendants' application of the Parental Secrecy Policy to Ms. Regino also violated in the past—and threatens to violate in the future—her parental rights for all of the ways previously set forth herein, including but not limited to the ways set forth in Paragraph 59, including all subparts.

65.     The District's actions toward Ms. Regino as alleged herein are not narrowly tailored to any compelling governmental purpose, do not further any important government purpose, and are not supported by any rational basis.

66.     Ms. Regino has no adequate remedy at law for these deprivations and will suffer serious and irreparable harm to her constitutional rights unless Defendants are enjoined as set forth herein.

67.     Ms. Regino is entitled to declaratory relief and preliminary and permanent injunctive relief invalidating and restraining Defendants from their

ongoing violations of her constitutional rights as set forth herein.

COUNT THREE
Facial Challenge to Parental Secrecy Policy
Under 42 U.S.C. § 1983
Procedural Due Process

68.   Ms. Regino hereby incorporates by reference all other paragraphs of this Complaint as though fully set forth herein, including but not limited to the Levine Affidavit.

69.   On its face, the Parental Secrecy Policy violated in the past—and threatens to violate in the future—Ms. Regino's fundamental right to direct the upbringing of her children; to make decisions concerning the care, custody, and control of her children; to direct the medical and mental health decision-making for her children; and to make private familial decisions regarding her children without undue interference by the state without providing adequate procedural safeguards, including a thorough investigation, notice, and an opportunity to be heard with respect to the deprivation of parents' parental rights.

70.   Ms. Regino has no adequate remedy at law for these deprivations and will suffer serious and irreparable harm to her constitutional rights unless Defendants are enjoined as set forth herein.

71.   Ms. Regino is entitled to declaratory relief and preliminary and permanent injunctive relief invalidating and restraining Defendants from their ongoing violations of her constitutional rights as set forth herein.

COUNT FOUR
As-Applied Challenge to Parental Secrecy Policy
Under 42 U.S.C. § 1983
Procedural Due Process

72.     Ms. Regino hereby incorporates by reference all other paragraphs of this Complaint as though fully set forth herein, including but not limited to the Levine Affidavit.

73.     As applied, the Parental Secrecy Policy violated in the past—and threatens to violate in the future—Ms. Regino's fundamental right to direct the upbringing of her children; to make decisions concerning the care, custody, and control of her children; to direct the medical and mental health decision-making for her children; and to make private familial decisions regarding her children without undue interference by the state without providing adequate procedural safeguards, including a thorough investigation, notice, and an opportunity to be heard with regard to the deprivation of her parental rights.

74.     Ms. Regino has no adequate remedy at law for these deprivations and will suffer serious and irreparable harm to her constitutional rights unless Defendants are enjoined as set forth herein.

75.     Ms. Regino is entitled to declaratory relief and preliminary and permanent injunctive relief invalidating and restraining Defendants from their ongoing violations of her constitutional rights as set forth herein

PRAYER FOR RELIEF

WHEREFORE, Plaintiff Aurora Regino requests the following relief:

1.     A declaration that the District's Parental Secrecy Policy is both facially

invalid and invalid as applied to her under the Fourteenth Amendment to the United States Constitution;

2.    A preliminary and permanent injunction preventing Defendants from continuing to implement the Parental Secrecy Policy, during the pendency of this litigation and at all times in the future, both facially and as applied to Ms. Regino;

3.    Costs and attorney's fees pursuant to 42 U.S.C. § 1988;

4.    A trial by jury on all claims for which Plaintiff has such a right; and

5.    Such further relief that the Court deems just and proper.

Dated: January 6, 2023                    Respectfully submitted,

By: */s/Harmeet K. Dhillon*
Harmeet K. Dhillon (SBN 207873)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
(415) 433-1700

Mark. Trammell*
MTrammell@libertyCenter.org
Joshua W. Dixon*
JDixon@LibertyCenter.org
Eric A. Sell*
ESell@LibertyCenter.org
CENTER FOR AMERICAN LIBERTY
1311 South Main Street, Suite 302
Mount Airy, MD 21771
Telephone: (703) 687-6200

*Attorneys for Plaintiff*
**Pro Hac Vice* Motions Forthcoming*

**VERIFICATION**

I, AURORA REGINO, pursuant to 28 U.S.C. § 1746, declare as follows:

    1.    I am over the age of eighteen years old, I am competent to make this verification, and have personal knowledge of the matters set forth herein.

    2.    I have reviewed the Complaint to be filed on my behalf in this matter.

    3.    I have personal knowledge of the factual allegations in paragraphs 1–2, 3 (first sentence), 4–23, 28, 35 (second sentence), 36–37, and 40–55 of the Complaint. Those allegations are true and correct to the best of my knowledge.

    4.    My daughter, A.S., informed me of the factual allegations contained in paragraphs 3 (all sentences other than first sentence), 24–27, 29–35 (first sentence), and 38–39 of the Complaint.  Based on my conversations with A.S., and her reputation and character of truthfulness, which I know based on my interactions with her as her mother, I believe these allegations to be true and correct to the best of my knowledge.

    I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed on January 5, 2022

                                                   *Aurora Regino*
                                               AURORA REGINO

1

VERIFICATION

2   I, A.S., pursuant to 28 U.S.C. § 1746, declare as follows:

3        1.    I am twelve years old.  I have personal knowledge of the matters set

4   forth herein.

5        2.    I have reviewed the Complaint to be filed on behalf of my mother in this

6   matter.

7        3.    I have personal knowledge of the factual allegations in paragraphs 3 (all

8   sentences other than first sentence), 24–27, 29–35 (first sentence), and 38–39 of the

9   Complaint.  I believe these allegations to be true and correct to the best of my

10  knowledge.

11

12      I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the

13  foregoing is true and correct to the best of my knowledge.

14

15  Executed on January 5, 2022

16

17                         _A.S._____

                                 A.S.

18

19

20

21

22

23

27