1      UNITED STATES DISTRICT COURT

2      EASTERN DISTRICT OF CALIFORNIA

3      --o0o--

4   AURORA REGINO,                    ) Case No. 2:23-CV-00032-JAM-DMC
                                      )
5              Plaintiff,             ) Sacramento, California
                                      ) June 27, 2023
6          v.                         ) 1:34 p.m.
                                      )
7   SUPERINTENDENT KELLY STALEY,      ) Re: Motion to Dismiss
    in her official capacity,         )
8   et al.,                           )
               Defendants.            )
9

10          TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE JOHN A. MENDEZ
11        SENIOR UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13  For the Plaintiff:      CENTER FOR AMERICAN LIBERTY by
                            JOSHUA W. DIXON, ESQ.
14                          1311 South Main Street, Suite 302
                            Mount Airy, Maryland  21771
15
    For the Defendants:     STUBBS and LEONE, P.C. by
16                          BRIAN A. DUUS, ESQ.
                            2175 North Carolina Blvd., Suite 900
17                          Walnut Creek, California  94596

18  Also Present:           Aurora Regino

19            MARYANN VALENOTI, RMR, CRR
                  Official Court Reporter
20             501 I Street, Suite 4-200
                  Sacramento, CA 95814
21             MValenotiRMRCRR@gmail.com
                    (916) 930-4275
22
    Proceedings reported via mechanical steno - transcript produced
23  via computer-aided transcription

24

25

1    SACRAMENTO, CALIFORNIA, TUESDAY, JUNE 27, 2023

2                        --oOo--

3        (In open court.)

4        THE CLERK:  Please remain seated and come to order.

5    Court is back in session.

6        Calling civil case number 2:23-cv-32 Regino versus

7    Staley.

8        THE COURT:  Good afternoon.  Counsel, state your

9    appearances, please.

10       MR. DIXON:  Josh Dixon, Center for American Liberty on

11   behalf of Plaintiff Aurora Regino, who is also here this

12   morning or this afternoon.

13       THE COURT:  Good afternoon.

14       MS. REGINO:  Good afternoon.

15       MR. DUUS:  Brian Duus of Leon, Alberts & Duus on

16   behalf of the Superintendent Kelly Staley of the Chico Unified

17   School District.

18       THE COURT:  All right.  Good afternoon.

19       Keep the mic in front of you, make sure we can hear

20   you, but you can remain seated.

21       Before the Court this afternoon is a motion to dismiss

22   by the defendant.  The Court has reviewed the briefs and has a

23   few questions for the attorneys.

24       First question -- actually, first comment.  There is a

25   request for judicial notice.  There's no objection to exhibits

1     A, C and D and the Court does take judicial notice of those.

2              Mr. Dixon, you opposed judicial notice of Exhibit B,

3     and I understand it's a lengthy document, and I don't need to

4     take judicial notice of the entire document, but the key

5     portion is the definition of "social transition" found on Page

6     78 and 79 of 261 in Exhibit B.  I wasn't clear why you were

7     objecting to the Court taking judicial notice of that or

8     accepting that as the definition of "social transition" when

9     it's identical to what you were arguing in the preliminary

10    injunction.

11             Remember I asked you a question about -- it talks

12    about and it says, "A social transition process can include one

13    or more of a number of different actions consistent where the

14    child's affirmed gender, including name change, pronoun change,

15    change in sex gender markers, participation in

16    gender-segregated programs, bathroom and locker room use,

17    personal expression and communication of affirmed gender to

18    others," and I remember during the preliminary injunction

19    hearing I asked you, "Isn't just one of those enough to be

20    social transitioning," and you said, "Yes."  So I'm somewhat

21    confused as to why you were objecting to that definition.

22             MR. DIXON:  Yes, Your Honor.  So our complaint

23    contains the definition of "social transition".  I could find

24    the paragraph number, if Your Honor would like.

25             Actually, here it is, Paragraph 2, "Social transition.

1   First, the active affirmation of a person's transgender

2   identity."

3        It goes on to say, "In the school setting it primarily

4   refers to calling a student by a new name associated with their

5   transgender identity and referring to the student by pronouns

6   associated with their transgender identity."

7        If you look at the definition of "transition" on

8   Exhibit B, it's simply not -- it's not limited to the school

9   context.  It is transition more generally.  It includes the

10  concept of medical --

11       THE COURT:  Where did you get your definition in the

12  complaint?

13       MR. DIXON:  It is from our expert, Your Honor, but it

14  is alleged in our complaint, so it is a fact that the Court

15  must accept for purposes of this proceeding.

16       THE COURT:  I understand that.  Look, I could take

17  judicial notice of the fact that Exhibit B contains a

18  definition.  You are correct that I can't -- and I won't take

19  judicial notice of the fact that this is the definition of

20  social transitioning given that there's a disagreement between

21  the parties.  So that's the only -- it doesn't really move the

22  argument forward, so I would deny the Request for Judicial

23  Notice as to the entire document, and at best, I take judicial

24  notice that there is a definition within Exhibit B of the term

25  "social transition," but it doesn't affect the case itself.

1    We'll come back to that.  Okay, that explains it to me.

2           The next question I have for you is this is a motion

3    to dismiss, so we are at a really early stage of the

4    proceedings, but are there any issues of material fact in this

5    case?  It seems to me to be almost a purely legal case that the

6    parties almost could try the case on the stipulated set of

7    facts.

8           I'm wondering, because two questions always come up in

9    motions to dismiss:  Is there something else you think you need

10   to get from the defendants in discovery which you haven't had

11   an opportunity to do, I assume, and second, if I did grant the

12   motion to dismiss, should I grant leave to amend?  I'm going

13   save that for the last part.

14          Just broadly, it's your case, are there facts here

15   that need further development?

16          MR. DIXON:  I think, broadly speaking, and Your Honor,

17   respectfully, if I may say this without committing, because

18   this is not something I've fully vetted in my own mind, but I

19   don't believe we would need extensive discovery in any event,

20   maybe none.  I do think -- I agree with Your Honor, this could

21   be a case that could potentially be tried on stipulated facts

22   depending upon what the District was willing to stipulate to.

23          For example, we allege in our complaint, as Your Honor

24   is aware, that social transition constitutes psychological

25   treatment.  I don't know if a District intends to dispute that

1  fact.  They did not for purposes of this proceeding.  That may

2  be a potential area that would be disputed, but if not, then

3  yes, I do think it's potential that we could resolve this case

4  on a stipulated set of facts.

5  THE COURT:  I can't convert a motion to dismiss to a

6  motion for summary judgment without prior notice, and I don't

7  intend to do that, but reading the briefs -- the second set of

8  briefs I've read.  I'm pretty familiar with this case now, I

9  couldn't really see this being the type of case where there

10  needs to be a lot of development of the facts, that there's a

11  lot of disagreement.

12  Mr. Duus, do you disagree?  I know Mr. Dixon argued

13  you don't, but I'm under the impression you disagree with their

14  argument that social transitioning is equivalent of

15  psychological treatment, medical treatment.

16  MR. DUUS:  I'm not a doctor, Your Honor, but I do

17  disagree with that because I think "social transitioning" is a

18  broad term and it doesn't always constitute medical treatment.

19  THE COURT:  Okay.

20  MR. DUUS:  But I would add that I don't think that is

21  necessary for the disposition of this motion.

22  THE COURT:  Your argument is even if it did constitute

23  medical treatment, that still the policy withstands a

24  constitutional challenge.

25  MR. DUUS:  Correct, Your Honor.

1          THE COURT:  Okay.  Okay, the six claims.  Let's start

2     with the substantive due process claim.

3          The law is clear that to establish a substantive due

4     process claim under 1983 claim that you are bringing here, the

5     plaintiffs are required to allege that, "One, a federal

6     constitutional right was violated, and, second, that the

7     alleged violation was committed by a person acting under the

8     color of state law such that it shocks the conscience."  That's

9     a Ninth Circuit case -- two Ninth Circuit cases, *Wong versus*

10    *County of Los Angeles* and *Brittain versus Hansen*, both held

11    that.

12         The Courts have held that the threshold requirement

13    for such substantive or procedural due process claims is

14    plaintiff's showing of a liberty or property interest protected

15    by the constitution.

16         The Supreme Court has required a careful description

17    of the asserted liberty interest that has been violated, and

18    Courts have also been cautioned against the expansion of

19    substantive due process rights, less the liberty protected by

20    the due process clause be suddenly transformed into a policy

21    preference of the Court.

22         Although the law does not require a case directly on

23    point for a right to be clearly established, existing precedent

24    must replace the statutory or constitutional question beyond

25    debate.

1    I haven't found -- and I don't think either party has

2    found, but I want to ask each of you -- that there is no -- you

3    cited some cases outside this district and from other

4    districts, and we could talk about those, but within the Ninth

5    Circuit, at least as we sit here today, there is no case that

6    had similar facts; am I correct?

7    A school district -- I know there are other district

8    court cases going on right now, but the Ninth Circuit hasn't

9    had a case with facts similar to this; otherwise, I'm sure you

10   guys would have cited it.  Can we both or all agree on that?

11   MR. DIXON:  Respectfully, Your Honor, I would agree

12   that there is not a case in the Ninth Circuit, at least not one

13   that I am aware of, involving social transitioning in school.

14   I don't think that answers the *Glucksberg* question, but I would

15   agree with that assessment.

16   THE COURT:  And, Mr. Duus, you would agree as well?

17   MR. DUUS:  I agree, Your Honor.

18   THE COURT:  Okay.  So the argument that the defendants

19   raise, Mr. Dixon, sort of goes to the heart of the case here,

20   is that your client is advocating for an expansion, for an

21   expansion of parental substantive due process rights that is

22   not supported by precedent, that you haven't provided any

23   controlling authority that would permit this Court to find that

24   the scope of your client's substantive parental rights covers

25   the instant, this case's circumstances.

1          None of the cases cited by you opine on whether the

2     State has an affirmative duty to inform a parent of their

3     child's transgender identity, nor whether the State must obtain

4     parental consent before socially transitioning a transgendered

5     child.

6          So, that's my first question to you.  What authority

7     in the Ninth Circuit can I rely on in denying a motion to

8     dismiss or the motion for summary judgment, if we're headed

9     down that road?

10         What do I rely on in terms of a case within the Ninth

11    Circuit that firmly demonstrates that the parental right to the

12    care, custody and control of one's child extends to the

13    circumstances of this case?

14         Are there any cases that share the facts of this case?

15         MR. DIXON:  Your Honor, let me say at the outset that

16    the Glucksberg test applies to what the Supreme Court has

17    described as "new rights."  As Justice Kennedy said in his

18    *Obergefell* majority opinion, when analyzing whether or not a

19    case falls within the confines of the substantive due process

20    clause, particularly in a case like this where the Supreme

21    Court has already held that parents have the right to the care,

22    custody and control of their children, the question is not

23    whether or not there is historical analogue for this precise

24    practice.  It is whether this practice comes within the

25    confines of the rights as already held.

1          So in *Obergefell*, the Supreme Court said, without

2    looking at history and tradition of same-sex marriage, said

3    that the right to marriage is established in *Loving* and other

4    cases, extended to same-sex situation.  So the argument here is

5    that we are not required to point to historical analogue

6    because Number 1, the Supreme Court has already said parents

7    have the right to the care, custody and control of their

8    children, and, Number 2, it falls within the confines of that

9    right as described.

10         To the extent Your Honor is not persuaded by that

11   argument, the *Parham* case is perhaps the best case that we have

12   here for establishing the existence of a preexisting right.

13   *Parham* establishes that parents have the right to control the

14   medical care that their children receive.

15         We have alleged in the complaint that social

16   transitioning constitutes psychological treatment,

17   psychological care, and so the Supreme Court has not decided,

18   for example, that an appendectomy -- that the parent has the

19   right to give a child an appendectomy.  The parent has the

20   right to control the medical treatment with respect to cardiac

21   issues.  But that level of granularity is not what the Supreme

22   Court is talking about in *Glucksberg*.  They're talking about

23   the proposition, Number 1, the State may not interfere with --

24   I'm sorry, may not command the medical care of the child, and

25   then Number 2, this constitutes medical care.  So it's a very

1    straightforward application of the *Parham* case.

2            THE COURT:  If I don't find that it constitutes

3    medical care, simply calling a student by the name that they

4    want to be called by or using the pronouns they want to use,

5    that that doesn't constitute medical care or a medical

6    decision, what happens with your argument?

7            MR. DIXON:  May I challenge that?

8            THE COURT:  I want you to assume that.

9            MR. DIXON:  Okay.  So assuming *Parham* doesn't apply,

10   then we've got two other arguments that we've put in the brief.

11   I know Your Honor is familiar with the brief.

12           THE COURT:  What is the medical treatment in *Parham*?

13           MR. DIXON:  The medical treatment in the *Parham* was

14   the voluntary commitment by the parents of the child to a

15   mental institution.

16           THE COURT:  That's not this case.

17           MR. DIXON:  That's correct, Your Honor, but, again, I

18   don't believe that Supreme Court would require for *a Glucksberg*

19   analysis, that each individual type of treatment be the subject

20   of a case holding.

21           The larger principle is the parents have the right to

22   direct and control the medical care of the children.  This, as

23   alleged, is medical care.

24           THE COURT:  Yes, but it has to be somewhat analogous,

25   that isn't even close to the facts of this case.  So why would

1    I want to rely on a case that isn't -- I mean, it's so easily

2    distinguishable.

3              MR. DIXON:  Well, Your Honor, we're here on a 12(b)(6)

4    motion.  We have alleged in our complaint that social

5    transitioning constitutes psychological treatment.  The reasons

6    for that is it's intended to alleviate psychological distress

7    associated with the mind-body mismatch.

8              We have alleged that it has the effect of hardening a

9    transgender identity.  We have alleged that it leads almost

10   inexorably to further graduated affirmative care.

11             We have pointed to at least four cases that say, and

12   one that holds, that social transitioning in the prison

13   context, the Eighth Amendment context, constitutes treatment.

14   So if social transitioning constitutes treatment in the Eighth

15   Amendment context, I don't see how it doesn't in the Fourteenth

16   Amendment context.

17             THE COURT:  Okay.  Hold that thought.

18             MR. DIXON:  Yes, Your Honor.

19             THE COURT:  Mr. Duus, do you want to respond?

20             MR. DUUS:  Yes, I would, Your Honor.  First off,

21   Mr. Dixon did not answer your question, so I will.  There is no

22   Ninth Circuit precedent.  We haven't been aware of any.

23             If this Court were to find that a parental right to

24   notice and consent before a school district, social

25   transitioning -- before a school district supports a student

choosing to transition from one gender to another, it would be

a dramatic expansion of the Fourteenth Amendment.

I mean, as far as this argument about medical

treatment, just calling something medical treatment doesn't

make it so.

THE COURT: Do I have to take it as true for purposes

of a motion to dismiss, though?

MR. DUUS: No.

THE COURT: Why not?

MR. DUUS: Because if you plead that a dog is a cat,

that is incorrect. Also, they could plead whatever they want

in their complaint, but look at what they actually pled. The

extent of what they've pled is that plaintiff's daughter, and

remember this case is filed by plaintiff, it was the daughter

who was the student who was actually experiencing these things,

the daughter went to talk to the counselor. The daughter said,

"I want to be a boy."

The first thing that they plead the daughter told the

counselor is, "I don't want to tell my mom because she would be

mad."

The only thing the counselor is alleged to have done

is responded to that by, yes, instructing a different use of a

pronoun by the daughter's choice at school.

Then they emphasize that, well, when the daughter

allegedly went to the counselor and said, I do want to tell my

1   mother, their language, the counselor was not supportive, but

2   said, "Look, tell some other family members before you tell

3   your mother."  Didn't tell her not to tell her mother, but

4   said, "Tell some other family members before."  How in the

5   world is that medical treatment?  It just isn't.  It's barely

6   counseling.  It's barely psychological treatment.  It's talking

7   to a counselor, which students do all the time.

8           THE COURT:  Let me ask you this:  Under this policy,

9   the school district's policy, if a parent does know that their

10  child is experiencing what the plaintiff's daughter went

11  through and specifically tells the District, "I don't want you

12  doing any social transitioning at all," and the child comes

13  back to school and says to the teacher and the counselor,

14  "Don't listen to my mom.  I want you to use this name and use

15  these pronouns," what does the District do under that scenario?

16          MR. DUUS:  So, I'm sorry, Your Honor, I didn't quite

17  hear the first part.  You're saying if the parent --

18          THE COURT:  The parent knows, the parent has

19  explicitly told the District, "Don't do this," yet the child

20  comes to school -- so now you have -- that's not this case, I

21  understand, but taking this policy out to its limits, under

22  that policy what does the District do when there is an actual

23  conflict between the parent and the child?

24          MR. DUUS:  Well, I think the first thing they would do

25  would be to call their lawyer, and the lawyer, if they were

1    honest, would say, "I don't know, but let's take a look at your

2    policy," and one thing that I do say about this regulation --

3              THE COURT:  So you haven't had that experience in real

4    life?

5              MR. DUUS:  Not yet, Your Honor.

6              THE COURT:  Okay.

7              MR. DUUS:  But this regulation is replete with

8    references to parents and guardians.  The first thing, as we

9    mentioned at the hearing on the motion for preliminary in

10   junction, is this regulation tells the District to address each

11   situation on a case-by-case basis in accordance with the

12   following guidelines.  And so in Your Honor's hypothetical, I

13   would note that while I don't know the answer to your question,

14   this regulation provides that the compliance officer may

15   discuss with the student any need to disclose the student's

16   transgender or gender nonconformity status with parents or

17   guardians.  In particular, I want to point out this is, "The

18   District shall offer support services such as counseling to

19   students who wish to inform their parents/guardians of their

20   status and desire assistance in doing so."

21             Then it says, "The compliance officer shall arrange a

22   meeting with the student, and if appropriate, the student's,

23   parents, guardians, to identify and develop strategies for

24   ensuring that the student's access to educational programs and

25   activities is maintained."

1          So under this regulation, I am 100 percent certain

2     that my advice to a school district would be you have to meet

3     with the parents.  If you have a situation where the student

4     has already told the parents, and the parents and guardians are

5     aware of it and object to it, this regulation is telling you

6     you have to set a meeting with the parents.  But, you know,

7     that frames the issue before the Court.  In this situation,

8     who's right is controlling; the student's constitutional right,

9     which we know exists, or the parent's alleged constitutional

10    right which there is no precedent for?

11         But if you were to recognize a parental constitutional

12    right, and this would be a policy decision since it would be a

13    brand new right being recognized, there are a lot of other

14    hypotheticals that I think we would all have to think about.

15    What if the parents disagreed; what if under your hypothetical

16    mom wanted to allow the child to transition and dad objected?

17         Here's another hypothetical:  Mr. Dixon is arguing for

18    the expansion of the Fourteenth Amendment.  Okay.  All right.

19    Parents have a right to notice and consent if their child is

20    being socially transitioned, is undertaking that, and parents

21    have a right to consent to that.  "I don't want my little girl

22    to become a boy."  Okay.  Well, let's recognize that

23    constitutional right.  Then do I, as a father, if I have three

24    girls and I get a fourth girl and I want a boy, do I have the

25    constitutional right to compel the social transition of that

1    girl to a boy?  That's the logical result, isn't it?

2              THE COURT:  Okay.  Do you want to respond at all?

3              MR. DIXON:  I would simply point out, Your Honor, that

4    the policy, it does mention "parents" a bunch, but the gist of

5    the policy and the text of the policy is parents shall not be

6    told if the child doesn't want them to be, unless the District

7    has quote "compelling evidence that disclosure is necessary to

8    preserve the student's physical or mental wellbeing."

9              Now, we've alleged that in every case social

10   transitioning without parental knowledge or consent and,

11   therefore, support is emotionally, psychologically damaging to

12   the child.  In every case it creates a psychologically

13   unhealthy situation where the parent and the child are at odds,

14   where the child perceives the parent as the enemy.

15             So this policy, by its own terms according to our

16   allegations in our complaint, can't apply.  It is impermissible

17   in all of its applications, including the application here to

18   my client.

19             THE COURT:  Your argument -- but your argument is that

20   this isn't an interference.  Normally that involves a proactive

21   event of some type.  This isn't a proactive policy.  It's a

22   reactive policy.  In no way does it take away the child, in no

23   way does it prevent the child from talking to her mother, and

24   in no way did it interfere with your client's rights to discuss

25   this with her daughter.  It was the daughter's choice not to

1  disclose it initially.  I know she found out through the

2  grandmother.  All the District did, and all it does under this

3  policy, is react to a decision made by someone else.

4       Your argument I would think carry more weight if, in

5  fact, the District was proactive.  They're not proactive here.

6  They're reactive, and I have great concern about finding a

7  substantive due process right in that type of situation.

8       It comes back to this argument raised in the briefs

9  that what you are really asking this Court to do is make a

10  policy decision.  It's a decision for the legislature.  It's a

11  decision for the Department of Education.  It's not a decision

12  for a court.  We get too involved already in day-to-day

13  minutiae of schools, prisons, decisions that should be made by

14  the legislature.

15       I take to heart those words that if you are going to

16  create a new -- and this would be a new-substantive due process

17  right, there's got to be more precedent in the law, that's what

18  I'm struggling with, and I want to give you an opportunity to

19  address that.

20       MR. DIXON:  Thank you, Your Honor, I respectfully

21  suggest --

22       THE COURT:  I wasn't elected, so...

23       MR. DIXON:  Yes, Your Honor.  Yes, Your Honor.

24       I respectfully suggest that the administration of

25  medical treatment by a school to a child consenting or not is

1    precisely an act for this Court to stop.  If the school, for

2    example, had a policy under which they would tell students that

3    everyday before school if you want to come get an Adderall just

4    to calm you down, we're going to allow that.  We're not going

5    to require it, we're going to allow the students to go get it,

6    but sorry, we're not going to tell your parents about that

7    either.  I think that would be plainly the provision of medical

8    treatment to the child, the child's choice, the school is not

9    requiring the child to make that choice, but they're conducting

10   medical treatment on children in violation of the parent's

11   constitutional rights to direct and control that.

12        THE COURT:  That's not this case, though.  It's not

13   even closely analogous to this case.

14        MR. DIXON:  But based on our allegation that social

15   transitioning constitutes medical treatment, which again at

16   this stage in the litigation, the Court must accept that is

17   perfectly analogous to what is going on.

18        THE COURT:  I only have to accept the fact if I don't

19   think it's a conclusory allegation.  I mean, that's based on

20   your expert's testimony.

21        MR. DIXON:  You are correct in that, Your Honor, you

22   don't have to accept conclusory allegations, but this is not

23   alleging that a dog is a cat.  In *Edmo*, the Ninth Circuit says

24   social transitioning constitutes psychological treatment.  We

25   cited three other cases that say the same thing.  The *Monroe*

1  case held in the prison context.  It would be improper at this

2  stage to discount that allegation; it's not a conclusory

3  allegation.

4          This is not Mr. Iqbal alleging that John Ashcroft was

5  involved in some massive conspiracy to deprive him of his

6  rights.  This is well within the range of reason particularly

7  considering the case law that has adopted that proposition.

8          THE COURT:  *Edmo* relied on the same definition as the

9  Exhibit B, though, right?

10         MR. DIXON:  *Edmo* --

11         THE COURT:  The Court acknowledged the WPATH standards

12 of care identification of social transitioning is a form of

13 treatment for those suffering from gender dysphoria, but it

14 relied on, again, the Exhibit B, not your expert's view, but

15 the requests for judicial notice Exhibit B definition, right?

16         MR. DIXON:  No, it didn't, Your Honor.  To be clear,

17 the *Edmo* did rely on the WPATH guidelines generally, but not

18 the definition -- all the defendant sought to introduce was the

19 definition of "social transitioning."

20         THE COURT:  Right.

21         MR. DIXON:  That's what we objected to.  *Edmo* does

22 rely on the WPATH for purposes of including whether it's

23 medical treatment, psychological treatment.

24         THE COURT:  But, again, your only evidence that using

25 someone's preferred name and pronouns, your only support that

1    that's medical treatment is your expert, right?

2         MR. DIXON:  Well, I mean, we have --

3         THE COURT:  There's no definition that says that.

4         MR. DIXON:  That is a fact that we have alleged in our

5    complaint.  We have cited case law.

6         THE COURT:  It's a conclusion.  Again, I know we are

7    in semantics, but it's important, especially under Iqbal, if I

8    view that simply as a conclusion, it doesn't have to be

9    accepted, right?

10        MR. DIXON:  Well, Your Honor, it does -- if you

11   conclude that it's a conclusory allegation, then under Iqbal

12   you're not required to accept it; however, it is not a

13   conclusory allegation.  We have alleged it is undertaken for

14   the purpose of alleviating psychological distress, and we have

15   alleged that it has serious and potentially lifelong

16   consequences.

17        THE COURT:  It's undertaken to protect the student

18   from harassment primarily.  A student has a right to privacy.

19   It's to avoid a student being harassed in school.  It's not

20   done for medical purposes.

21        MR. DIXON:  That's contrary to the allegations in our

22   complaint, Your Honor.  Allegations in the complaint is that

23   it's undertaken for the purpose -- social transitioning is

24   undertaken for the purpose of alleviating stress.

25        THE COURT:  The allegation has to be plausible.  You

1    think that's plausible?

2           MR. DIXON:  That social transitioning is undertaken

3    for the purpose of alleviating distress?  Yes, Your Honor, that

4    is precisely why --

5           THE COURT:  No, that it's medical, that it's a

6    psychological treatment.

7           MR. DIXON:  Yes, Your Honor.

8           THE COURT:  Okay.

9           MR. DIXON:  Yes, Your Honor.

10          THE COURT:  Okay.

11          MR. DIXON:  And I would point Your Honor to the cases

12   we cited in our brief where medical causation, for example, is

13   allowed to be alleged.  A plaintiff is not required to employ

14   an expert to come in and testify that the pain he's feeling is

15   because of the cancer he got due to the defendant's actions.

16   These are the types of allegations that are made in complaints

17   everyday.  These type of somewhat specialized, somewhat

18   technical causation, scientific, whatever you want to call

19   them, types of allegations are precisely what the rules allow

20   in this setting.

21          THE COURT:  Okay.  Next question for you:  Would your

22   client argue that her alleged parental right should extend to

23   the school's affirmation of a child who identifies in school as

24   gay or lesbian and doesn't want their parent to know?

25          MR. DIXON:  No, Your Honor.

1          THE COURT:  Why not?

2          MR. DIXON:  And this is a point we have made in our

3     two or three briefs that we filed in this case.  This case has

4     nothing to do with the LGB -- LGB.  It is only about the "T" of

5     the LGBT student.

6          The idea here is that if a student, for example, comes

7     to a social counselor and says, "I think I may be transgender,"

8     there's no obligation, no duty on the part of the counselor to

9     tell the parents of that.  It is when the District, as it did

10    here, undertakes the affirmative obligation or affirmative act

11    of telling everyone in the school, You must refer to the

12    student in this way.  You must participate in socially

13    transitioning this child, which is precisely what the policy

14    does here on pain of sanction.  The District says all

15    administrators, all teachers, all other students must

16    participate in the social transitioning of this child.  So if a

17    student comes to a counselor and says, "I think I may be

18    lesbian.  I think I may be gay.  I think I may be bisexual" --

19         THE COURT:  Nonbinary or gender non-conforming.

20         MR. DIXON:  -- whatever, that is beyond the scope of

21    the right we are asserting here.

22         THE COURT:  You argue that children are unable to

23    provide informed consent to psychological treatment, that's in

24    your opposition brief.  Are you -- is your client claiming that

25    children should not be permitted to attend school counseling or

1   guidance sessions about parental notice absent parental notice
2   and consent?

3       MR. DIXON:  We don't allege that -- there is a case
4   that the District cited, it's called *Thomas*, and I don't
5   remember the school district's name -- Evansville, I believe.
6   It was an unpublished decision of the Second Circuit where the
7   Second Circuit said conversations with the guidance counselor
8   regarding academic matters are beyond the purview of the
9   parental right.  That is our view as well.  These types of
10  routine conversations with the guidance counselor, no, that
11  does not constitute psychological treatment.  If however a
12  student were to go in a guidance counselor's office for a
13  sustained course, I don't know, call it hypnotherapy, now we
14  have a problem.  Now the school is administering psychological
15  treatment just as it is in the social transitioning context.
16  But no, an ordinary conversation with a guidance counselor, no,
17  Your Honor, that's not part of what our complaint is about.

18      THE COURT:  Okay.  Are instances of physical or
19  physically-invasive medical treatment and procedures on minors
20  distinguishable from psychological treatment with respect to
21  your client's alleged parental right to make medical treatment
22  decisions for her children?

23      MR. DIXON:  From a constitutional standpoint, if it
24  constitutes psychological or medical treatment, no, there is no
25  difference.  Now, obviously one might lead to a greater set of

1   damages, but when it comes to whether or not the parental right

2   is triggered, yes, Your Honor, it is, and if I may, and please

3   stop, I know you will, but please stop me if I'm not answering

4   your question the way you want me to, but Your Honor said

5   earlier that the child plainly has a privacy right, and I would

6   strenuously object to that point.  I mean, the Supreme Court

7   has never once held that a child has a privacy right in this

8   setting versus their parents.  In fact, if you look at the

9   historical sources that we've cited  in our brief, *Blackstone*

10  and *Kent*, children have a duty of obedience to their parents,

11  under both the common law and at the time the Fourteenth

12  Amendment was adopted.  The notion that children have a privacy

13  right against their parents would be anathema both to the

14  founders and the framers of the Fourteenth Amendment.

15          The case that the District cites in support of that

16  proposition, there are a couple, but the primary one is

17  *Bellotti*.  In *Bellotti* the Supreme Court held that a state

18  statute that required parental notice for an abortion did

19  prevent problems vis-a-vis the child's right to an abortion

20  under the Fourteenth Amendment.  There's a lot of reasons that

21  doesn't extend to today's issue, primarily *Dobbs* has overruled

22  *Bellotti*.  *Bellotti* is no longer good law on that point.

23          As it stands right now, the Supreme Court has never

24  once held in a holding that is currently binding that parents,

25  or the children rather, have any privacy right whatsoever

1    against their parents.  Not a single case.  I would also

2    submit, Your Honor, that Bellotti was an extremely unique case

3    in that the right at issue was the right to an abortion.  That

4    is a right that due to the nature, the sui generis nature of

5    pregnancy, meaning the right must either be exercised or lost

6    within the short window of human gestation is a very unique

7    right.

8           The Supreme Court has held that adults, for example,

9    have the right to marry.  There's no problem with prohibiting

10    minors from getting married.

11           The Supreme Court has held that adults have the right

12    to engage in sexual relations.  There's no problem with

13    prohibiting minors from engaging in that, and the reason for

14    that as the Supreme Court in *Bellotti* has told us, that those

15    are the types of rights that can be exercised when the child

16    reaches the age of majority.  If the child wants to get

17    married, parents can say no.  The State can say no because the

18    child can get married at 18.

19           The same is true here.  Nothing about the "right at

20    issue," quote, unquote, the right at issue here, the right to

21    privacy that the District asserts is evaporating.  There's no

22    reason to apply the rule of *Bellotti* to it.  A child who wants

23    to be socially transitioned can do that when that child reaches

24    the age of majority.  The one case that we can figure that they

25    have cited for this proposition that is still good law is the

1      *Wolf* case out of the Central District of California.  In the

2      *Wolf* case it is true that the Court in that case held that a

3      minor child had a right to privacy against her parents

4      vis-a-vis her sexual orientation.  That case did not cite

5      *Blackstone*.  Did not cite *Kent*.  Did not cite a single Supreme

6      Court case.  It cited one case, a case called *Sterling* out of

7      the Third Circuit that held that an adult has a privacy right

8      when the State discloses his homosexual status to his family.

9      There is no warrant to extend that case law to minors.  I mean,

10     the *Bellotti* opinion and *H.L.* opinion, opinions we've cited in

11     our brief, are chock full of reasons and justifications for why

12     minors rights do not extend to the full extent of adult's

13     rights.

14              Children are immature, as the *Parham* case tells us.

15     Their perception of what they might want today is different

16     from what it might be tomorrow.  They need the instruction.

17     They need the guidance of their parents in these types of

18     situations.  So even if the Supreme Court had held that adults

19     have the right to privacy of a transgender identity, that would

20     not extend to the parents.

21              THE COURT:  I want to give Mr. Duus an opportunity to

22     respond to that point.  Mr. Duus?

23              MR. DUUS:  Your Honor, *Bellotti* is pretty clear; a

24     child merely on account of his or her minority is not beyond

25     the protection of the Constitution.  As the Court said in *In re*

1    *Gault*, whatever may be the precise impact, neither the

2    Fourteenth Amendment nor the Bill of Rights is for adults

3    alone.  They're born a citizen of the United States.  You have

4    constitutional rights upon birth.

5          Now, I understand that in certain circumstances that

6    we've recognized in our papers, parents have the right to

7    control in the custody of their children.  It's usually against

8    state interference such as involuntary imprisonment or unwanted

9    medical treatment.  But look at all the cases we've cited

10   where -- okay, let me take a step back.

11         So given *Bellotti*, given the Constitution, you have to

12   start with the premise that a child has constitutional rights.

13   So whether you fall under liberty, whether you fall under

14   privacy, we've cited ample authority that the right to gender

15   expression is a protected right.  I mean, to quote -- this is

16   Third Circuit, but it was quoted by the Ninth Circuit in the

17   *Nelson* case, but the Third Circuit in *Sterling* held it is

18   difficult to imagine a more private matter than one's sexuality

19   and a less likely probability that the Government would have a

20   legitimate interest in disclosure of sexual identity.

21         So if you start with the premise that a child has some

22   right, some right to privacy, some right to liberty, some right

23   to express their gender the way they want to, okay, if we could

24   agree on that, at least to some degree -- and I don't agree, by

25   the way, that the idea of a child's privacy would have been

1    anathema in 1776 or 1789.  I'll give you an example.  A diary,

2    the parents didn't regularly read Jane -- well, Jane Austin was

3    English -- but parents didn't regularly read Phillis Wheatley's

4    diary.  There's always been some degree recognized of privacy

5    even amongst the most intimate of families.

6           So what they're asking this Court to recognize is

7    something that has never been recognized:  A parental right to

8    notice and consent when a child expresses their gender.

9    There's no precedent for it.  As I mentioned earlier, to

10   recognize that right would lead to a lot of really maybe

11   unforeseen and unwanted consequences.  I mean, that's a big

12   step for a government of limited powers to say that under the

13   Fourteenth Amendment we're going to expand this parental right

14   that we've never recognized before.

15          THE COURT:  Again, just so we're clear, we talked

16   about this at the injunction motion, but I agree with the

17   plaintiff here, she's not really asking the Court to find that

18   the parent has a right to notice or consent simply if the child

19   came to school and said -- if her daughter came to school and

20   said, "I don't want to be called this name, I want to be a

21   boy," their view is the District doesn't have to provide any

22   notice to the parent if the child just says that.  Notice from

23   their point of view, and correct me if I'm wrong, is simply

24   required the minute the District starts social transitioning,

25   again, equating social transitioning to medical treatment.  So

1       it's a slightly different claim than the way you frame it.

2               So the question is, again, is that a substantive due

3       process right if, again, the District simply has -- if the

4       facts of this case reveal the District simply agrees with the

5       child's request and calls the child by different name and uses

6       different pronouns?

7               MR. DUUS:  I understand their argument, Your Honor.

8       They're saying -- I mean, it goes to the crux of this case.

9       They're saying, Look, the problem here was that A.S. was being

10      treated as a boy at school, but as a girl at home, and the

11      mother had a right to know that.  Okay.

12              Well, that's balanced against -- that would be

13      recognizing a substantive due process right to Ms. Regino or

14      Mrs. Regino, which there is no precedent for, but balance that

15      against the fact that we do have a precedent recognizing a

16      child's right to privacy and to protect their own expression of

17      their gender or sexuality.  And if it came down to it, like the

18      scales of justice, you would have to weigh the child's right

19      against the parents.  I think particularly under the factual

20      allegations in this complaint as we went through earlier and as

21      Your Honor pointed out, this is the school district reacting to

22      A.S.  They're reacting -- so to give you an example, a concrete

23      example, the first conversation -- in the first conversation

24      that's alleged when A.S. tells the counselor, "I would like to

25      be known as a boy."  The counselor asks, "Do you have a boy's

1    name," and she said, "Yes." She already had a boy's name.

2    She's reacting to that. This isn't a case of compulsion.

3          Your Honor, if I could address a couple of the points

4    about the medical issue.

5          THE COURT: Go ahead.

6          MR. DUUS: Mr. Dixon mentioned a child going and

7    getting Adderall. Okay, let's think about that for a second.

8    Adderall is a controlled substance. Adderall is subject to

9    extensive regulation under the FDA, under federal and state

10   law. So it isn't the same thing. And I think the presence of

11   all those regulations is why Adderall is considered to be

12   medical treatment in a way that may be giving a kid something

13   else, you know, I don't know, Gatorade, soda or something else,

14   it's not medical treatment, right. That's why I dispute that

15   all social transitioning equates to medical treatment. There

16   isn't any authority for that. I would notice that also they

17   did not object to our request for judicial notice of the

18   regulation. The regulation itself contains a definition of

19   "gender transition" that's pretty much the same as the WPATH

20   definition, and at least from the school's perspective. It's

21   the process in which a student changes from living and

22   identifying as a sex assigned to the student at birth to living

23   and identifying as the sex that corresponds to the student's

24   gender identity. That's not necessarily a medical decision. I

25   mean, "medical" to me means you are actually taking action on

1   someone's body.  That's the difference between medical and

2   psychological, right?  I mean, the District's regulation

3   doesn't even contemplate that, and there aren't any allegations

4   of that in the complaint.

5           THE COURT:  Okay, let me come back to the plaintiff.

6           You cited a case out of the Kansas District Court,

7   recent case, May 9, 2022, *Ricard versus USD*.  The question I

8   have for you is you why should I consider the holding of *Ricard*

9   which, again, different facts.  It involved religious freedom

10  of exercise for teachers, or the other case you cite *BPJ versus*

11  *West Virginia Board of Education* under equal protection Title 9

12  for student athlete case.  Why should I consider the holdings

13  of those two cases when the balance of the parental rights were

14  not at issue either case?

15          MR. DIXON:  Before I get there, may I make one more

16  point on the privacy argument?

17          THE COURT:  Go ahead.

18          MR. DIXON:  Simply, we've explained in our brief why

19  there is no privacy right, but let me also emphasize it in the

20  *Wolf* case the Court said that to the extent the privacy right

21  exists, it only exists when the child has a reasonable

22  expectation of privacy.

23          In the *Wolf* case, the Court said that expectation was

24  there because the child had only come out to five friends.  In

25  this case the District socially transitions a child throughout

1   the school community, as I mentioned earlier, all

2   administrators, all teachers, all other students.  In that

3   situation, as a matter of law, there cannot be a reasonable

4   expectation of privacy.

5          In addition, the right can be overcome when the

6   District has compelling or sufficient countervailing

7   considerations, and I would submit here, Your Honor, the

8   parental right is a sufficient countervailing consideration.

9          On the *Ricard* case, Your Honor, it is true out the

10  District of Kansas that that case involved a claim by a

11  teacher.  The Court noted in dicta, it would have been that

12  parents have the right to have a say in what their children are

13  called in school.

14         It is -- you're right, Your Honor, it is not holding,

15  but that case does state that parents have a right to say what

16  their -- parents have a right to say what their children are

17  called in school, and then it went on to hold that the policy

18  did not satisfy strict scrutiny because of the presumption that

19  was at issue in that case, and that's precisely what our

20  allegation is here.

21         The policy presumes that when a child says to a

22  administrator, "I want to transition and I don't want my parent

23  to know," the presumption is that by that statement, "I don't

24  want my parent to know," that the parent is an abusive parent,

25  that's the District's argument, that that is the reason for the

1    secrecy.  Because the child doesn't want the parent to know,

2    the District presumes that that parent is an abuser and will

3    harm the child.

4            THE COURT:  That's your argument of their argument.  I

5    didn't read that in their brief, but that's your interpretation

6    of their argument.

7            MR. DIXON:  Well, that is --

8            THE COURT:  I don't recall them saying that in their

9    brief, but go ahead.

10           MR. DIXON:  What they say is the justifications for

11   the policy are, Number 1, privacy, which I believe does not

12   exist.  There is no justification.  It is a vapor.  It does not

13   exist.

14           The second justification is the prevention of child

15   abuse.  Now, the policy --

16           THE COURT:  No.

17           MR. DIXON:  Yes, Your Honor.

18           THE COURT:  It's an anti-harassment policy.  I don't

19   think it's an anti child abuse.  I know that was your argument

20   interpreting their argument, but go ahead, make your point.  I

21   read the briefs.

22           MR. DIXON:  Yes, Your Honor.  I don't want to belabor

23   the point, I will find it for you, but that is the two

24   justifications they give for the policy, in their briefing, is

25   student privacy, which again does not exist, and even if it

1    did, it would be overcome by the parental right here, and

2    Number 2, it's for the prevention of domestic abuse, prevention

3    of child abuse, essentially -- not essentially, what the

4    district is doing is saying that if a child says, "I don't want

5    my parents to know," they're refusing to tell the parent

6    because doing so would lead to child abuse.  That is an

7    impermissible presumption under the *Stanley* case.

8         THE COURT:  Okay.  If I granted the motion to dismiss

9    on the facial challenge, does your as-applied challenge also go

10   away, or is there a basis for you maintaining your as-applied

11   challenge?

12        MR. DIXON:  There is a basis for us maintaining the

13   as-applied challenge.  The standards are the same.  You look to

14   whether it, you know -- the only difference in a facial and

15   as-applied challenge is the scope of the remedy.  The facial

16   challenge would seek to strike the policy in all of its

17   applications.

18        The as-applied challenge would seek to hold that the

19   District -- the policy may not be applied as to Ms. Regino.  So

20   if Your Honor were to conclude -- we would respectfully

21   disagree, but if Your Honor will conclude this permissible in

22   some set of applications based on the facts we've alleged, it

23   is unpermissible as applied to Ms. Regino.

24        Your Honor, while I was looking, I found the quote.

25   It's on Page 17, "The District has a legitimate interest to

1    protect the student's privacy and create a zone of protection

2    from potential domestic abuse." So those are the two

3    justifications that the District gives for the policy. That's

4    on Page 17, end of the first paragraph.

5              THE COURT: Do you want to respond to that?

6              MR. DUUS: Yes, Your Honor. Mr. Dixon forgets the

7    first line of the sentence, we're citing a case, and since he

8    spent so much time citing out-of-circuit authority, we cited

9    *J&J Parents*, and the quote is here, "As discussed in *J&J*

10   *Parents*, the District has legitimate state interest to protect

11   the student's privacy and create a zone of protection from

12   potential domestic abuse. Maintaining the confidentiality of

13   the student's gender identity has a reasonable relationship

14   with that interest."

15             So yeah, as discussed in *J&J*, one of the policy

16   considerations behind this regulation is to prevent potential

17   abuse because, remember, why didn't A.S. want to tell her

18   mother about her transition, because, in their own allegations,

19   she was afraid that her mother would be mad. I'm not saying

20   that there was a risk of domestic abuse, I don't know. I don't

21   think there is. I don't think there are the facts to support

22   that in this case, but as discussed in *J&J Parents*, yeah,

23   that's one of the reasons for this policy, that that's a

24   potential, but that's not the only reason. One is that maybe

25   the child just isn't ready to tell their parents for whatever

1    reason.  Short of domestic abuse, maybe they're just afraid

2    their parents are mad or angry.  Maybe they need time to

3    express themselves and figure out if this is even the right

4    thing for them to do, right?  Maybe they'll change their minds

5    and the parent never knows about it, but our position certainly

6    isn't that that's the only reason or justification for this

7    policy or this regulation.

8         THE COURT:  Okay.  Come back because I still wasn't

9    clear on your answer about -- so how would you maintain the

10   substantive due process as-applied challenge if you couldn't

11   maintain the facial challenge?

12        MR. DIXON:  So to that point, Your Honor, it is our

13   view that the right is triggered, the parental right is

14   triggered by virtue of the allegations in the complaint.  The

15   analysis then turns to is there a compelling interest?

16        The District asserts, as Mr. Duus just conceded, that

17   privacy and the prevention of dispute of parental abuse are the

18   two justifications for the policy.  Privacy, as we've already

19   demonstrated, is a vapor; it doesn't exist.  There is no

20   privacy right that children have against their parents with

21   respect to social transitioning by the school.

22        Number 2, the District asserts that that has a

23   compelling interest in the prevention of child abuse.  We would

24   concede that the prevention of child abuse is a compelling

25   governmental interest; however, it must be narrowly tailored

1     under the *Stanley* case.  In the *Stanley* case, Your Honor, the

2     father was unwed father, the mother died.  The State had a

3     procedure for where the children go, and the State -- the

4     procedure presumed that an unwed father is not fit to raise the

5     children, so the State takes them.  The Supreme Court said that

6     type of presumption is constitutionally impermissible because

7     it reverses the constitutionally-mandated presumption of

8     parental fitness and parental affinity.  If there is an

9     adjudicative process that determines the father is not fit,

10    that's one thing, but what we've got here is a presumption that

11    the father is unfit based on nothing more than the unwed

12    status.  That's precisely what we have in this case.  We have a

13    presumption based on a child who says, "My mother would be

14    mad."

15          I mean, the mother might get mad for -- I don't think

16    I need to belabor the point that a child being fearful that the

17    mother might be mad has no reasonable relationship to the

18    prevention of child abuse.  So that governmental purpose is

19    simply not narrowly tailored.  We've alleged in the complaint

20    that Ms. Regino is not a child abuser.  She has nothing but

21    love for her daughter, as evidenced by the fact that when this

22    happened, she did precisely what the District refused to do,

23    which is get the child help that the child needed rather than

24    leave the child on an island to simply have the gender

25    confusion issue swirling around her 11-year old head, perhaps

1   resulting by the social transitioning in this child, having

2   these types of feelings for the rest of her life, having a

3   situation where she goes on to puberty blockers, and then

4   medicalization again causing sterility for the rest of her

5   life.  The mother did what the District would not do, which was

6   take the child to get the help the child needs and the child

7   today for now is identifying, again, as a girl.  So the right

8   here --

9           THE COURT:  You went way beyond my question.  If I

10  found in the substantive due process claim the facial challenge

11  that your client hadn't established a federal constitutional

12  right, a substantive due process right, then you would agree

13  with me that you could not maintain the as-applied challenge.

14          MR. DIXON:  If Your Honor concludes that we have not

15  alleged the existence of a federal constitutional right, then

16  that holding applies to Ms. Regino as applied as well.

17          I respectfully suggest --

18          THE COURT:  I know you disagree.

19          MR. DIXON:  Yes, Your Honor.  If I may, Your Honor

20  started off the line of questioning by asking about what if I

21  conclude this isn't medical treatment?  For the reasons we have

22  discussed, I believe Your Honor is required to accept that

23  allegation.  It's a psychological treatment.  I also want to

24  make a very quick point before I get there.  For purposes of

25  constitutional analysis, there's not a difference between

1   psychological and medical treatment.

2       Mr. Duus has tried to draw the distinction between

3   Adderall being a controlled substance.  As we perceive the

4   Ninth Circuit and the Supreme Court holdings, there would not

5   be any difference if instead of the Adderall hypothetical, the

6   hypothetical were hypnotherapy or some other form of

7   psychotherapy.  I mean, medical treatment, psychological

8   treatment, whichever it is, it is controlled by the rule of

9   *Parham*.

10      Assuming Your Honor disagrees, however, that

11  psychological treatment is what we've alleged here, social

12  transitioning constitutes psychological treatment, there are

13  two other prongs of analysis we have alleged a substantive due

14  process.

15      THE COURT:  What if I disagree under the facts of this

16  case two things happen:  One, they agreed to call her by a

17  different name, and, two, they agreed to use different

18  pronouns, that's all that happened in this case, taking those

19  facts under those circumstances, can a Court conclude that

20  that's medical treatment?  What happens then?

21      MR. DIXON:  Assuming for the sake of argument --

22      THE COURT:  Because I've now accepted all your facts

23  as true, I just don't accept your conclusion that that's

24  medical treatment.

25      MR. DIXON:  If Your Honor does not accept that

1  conclusion, we still have stated a constitutional claim under

2  two different modes of analysis. So far, this entire argument

3  has been about one of the three we've alleged, medical

4  treatment.

5       We have also alleged that social transitioning, i.e.

6  sexual identity, gender identity of the child, is an important

7  decision that parents should be allowed to make even

8  independent.

9       THE COURT: This policy doesn't interfere with that.

10 It doesn't in any way interfere with that. It doesn't prevent

11 the child from telling her mother. It doesn't prevent the

12 parent from asking questions of her child. Again, it's not

13 proactive, it's reactive. They don't sign a note or tell the

14 child, "Don't you dare tell your mom what's going on in

15 school." That's not this case. So if that's your argument,

16 again, you could say, "I have issues with that," because

17 they're not -- they didn't interfere with your client's

18 parental rights in any way. They reacted to what the child was

19 telling them.

20      MR. DIXON: They reacted to what the child was telling

21 them --

22      THE COURT: And that's all they did.

23      MR. DIXON: -- and they kept it secret. They imposed

24 a regime where they mandated everyone in the school environment

25 to address the student in a different way, and then

1    intentionally refrained from telling the parents about that

2    activity.  Even if that did not constitute medical treatment,

3    the implications of social transitioning, as we have alleged,

4    even if Your Honor does not accept our characterization of

5    "psychological treatment," the lifelong implications of social

6    transitioning on the child's identity are sufficient to allege

7    an infringement with the parent's parental right.  We have a

8    situation where children are not permitted to get --

9             THE COURT:  Do you want me to impose an affirmative

10   duty on the District to tell the parent?

11            MR. DIXON:  Only if --

12            THE COURT:  I'm not a legislator.  That's a question

13   for the school board.  That's a question for the Department of

14   Education.  That's not a constitutional question for a judge in

15   my view.  I think you are in the wrong forum.  I know you

16   disagree.

17            MR. DIXON:  Respectfully, I do.

18            THE COURT:  I struggle with that.  If you know me at

19   all, I think the powers in -- the responsibilities of a Federal

20   District Court are limited, and they should be limited.  I know

21   other judges don't agree, but I'm a judge. I didn't get

22   elected.  If I'm going to establish some policy that says to

23   the school district and every school district in the State of

24   California, "You got to tell parents now," who am I to say

25   that?  No one elected me to make that decision.

1    MR. DIXON:  Respectfully, Your Honor, we believe that

2    is required by the case law that is cited in our brief.  I

3    mean, I understand -- I don't believe that that is a

4    legislative decision.  Sure, it's something that a legislature

5    could do, but it is something that we believe is

6    constitutionally mandated.

7    THE COURT:  Okay, I get it.

8    MR. DIXON:  If I may, one more.

9    THE COURT:  No.  I want to get real quickly to the

10   procedural due process claim, because, again, I'm trying to

11   understand your argument.  I know that the plaintiffs have

12   raised -- I'm sorry, the defendant has raised the argument that

13   again this was a legislative enactment.  If there's any

14   procedural due process right that your client has, it's in the

15   procedure followed to enact the policy, but after that it

16   applies to everyone, and nothing's been violated here.

17   Again, you need a deprivation of a

18   constitutionally-protected liberty, a property interest, and

19   you need a denial of adequate procedural protections.  There is

20   not a lot of discussions in the briefs about this, but I know

21   if I don't find that there was a constitutionally-protected

22   liberty or property interest violated here, those claims go

23   away as well.  But again, I didn't really understand the

24   opposition to the argument raised by the defendant on the

25   procedural due process claim.

1          MR. DIXON:  So the cases that the District cites for

2     purposes of arguing that this is a legislative enactment stand

3     solely for the proposition that a legislative enactment, people

4     are not required to give -- to receive notice that the

5     legislator is contemplating a law.  People can follow the

6     legislative process and go in and make their voices heard prior

7     to a law being enacted.  This case, however, this situation,

8     this policy, imposes a procedural regime, an established state

9     procedure under which a student comes in, evidentiary

10    assessments are made on a quote -- I quote from the policy, "a

11    case-by-case basis," and unless there is compelling evidence of

12    this and such, then the District will not tell the student --

13    the student's parents, rather, that's an adjudication.  That's

14    not a legislative decision.  That's an adjudication that is

15    made on the ground, and the case law establishes that when a

16    property right is finally extinguished or interfered with at

17    that time, there must be notice and an opportunity to be heard.

18    So the deprivation occurs at the moment the school begins to

19    socially transition the child.  At that time the parent is not

20    informed.  There has been an adjudication; the parent has been

21    deemed to be an abuser, and the school is doing this social

22    transitioning without notice, without opportunity to be heard.

23          So, I mean, we've cited a couple of cases in the

24    brief, Cleveland v. *Loudermill*, *Logan against Zimmerman Brush*.

25    There are scores of cases where a legislative enactment creates

1    a procedural regime that when applied, results in a deprivation

2    of a liberty protected interest.  That's precisely what we have

3    here.

4         THE COURT:  I understand.  Mr. Duus, you want to

5    respond to that at all?

6         MR. DUUS:  Yeah, Your Honor.  I mean, they admit in

7    opposition that it was a legislative enactment.  I don't even

8    understand the argument that a school district personnel

9    interacting with a child is an adjudication that would take --

10   that would somehow affect the regulation.  I don't see any

11   authority for that.

12        I would like to point out something in their papers

13   because Mr. Dixon earlier mentioned that this case was about

14   all this social transitioning that was affecting A.S. and

15   swirling about her head, and the District set up this regime

16   not to tell the parents.  That isn't what is alleged in their

17   complaint, which is the operative document.

18        In their complaint, Paragraph 8, they said, "After

19   several weeks of the District treating Ms. Regino's daughter as

20   a boy," so this went on for several weeks at most according to

21   their own allegations.  Then why did Ms. Regino ultimately find

22   out that A.S. was doing this?  It's because -- and these are

23   their words not mine -- the counselor "encouraged A.S. to speak

24   with other family members before telling her mother."  So

25   contrary to the argument that's being made now their operative

1    complaint, what they allege, which is controlling, is that the

2    counselor encouraged A.S. to tell other family members before

3    telling her mother and that's how the mother found out.  A.S.

4    did tell her grandmother who told the mom.  So this argument

5    that there is this secrecy regime or the parental secrecy

6    policy, it's not even supported by their own allegations.

7              THE COURT:  Okay.

8              MR. DIXON:  Your Honor, may I make one more point?

9              THE COURT:  No, no.  Let me focus now on the last two

10   claims, the First Amendment.

11             With respect to your First Amendment claims, what

12   authority in the Ninth Circuit firmly demonstrates that the

13   right to family integrity and association extends to the

14   circumstances of this case?  Are there, again, any cases that

15   share the facts of this case?

16             MR. DIXON:  Your Honor, we cited the *Keates* case in

17   our brief, which establishes that the right to family integrity

18   arise under both the First and Fourteenth Amendment.

19             THE COURT:  I'm just agreeing with you in a general

20   principle, but that's not my question.  What authority in the

21   Ninth Circuit firmly demonstrates that the right to family

22   integrity and association extends to the facts of this case?

23             MR. DIXON:  Well, let me be clear.  The First

24   Amendment claim we make applies to all three of our arguments.

25   It is a claim for intimate association, and that intimate

1    association head, as it were, has three components that we've

2    alleged here:  Right to medical treatment; right to make

3    important decisions; right to family integrity.

4          Now, I could speak specifically about the family

5    integrity argument, but I wanted to make clear that the First

6    Amendment argument is broader than just associational rights

7    from a family integrity standpoint.

8          THE COURT:  Just asking for a case.

9          MR. DIXON:  Yes, Your Honor.  Give me one moment,

10   please.  The question was there case law from the Ninth

11   Circuit, as I understand it, that applies to social

12   transitioning context.  I am not aware of such a case, Your

13   Honor.  We have cited out-of-circuit authority for the

14   proposition that interferences like these that draw a wedge

15   between parent and child, acts by the Government that preclude

16   the parents from knowing the influences that are being imposed

17   on their children.  Those types of allegations satisfy this

18   family integrity right, but I'm not able to cite a social

19   transitioning case out of the Ninth Circuit.

20         THE COURT:  Next question:  How should the Court

21   approach the integrity of the parent-child relationship when

22   the school's mandatory disclosure requirement would, by design,

23   require the school to insert itself into that relationship even

24   where the child expressly forbids it?

25         MR. DIXON:  Well, if the -- you know, as discussed,

1  the child does not have a right to preclude disclosure.  This

2  is a bit like saying the child made an F on the report card and

3  doesn't want his parents to know.  So this is really not very

4  different from any other types of disclosures which the schools

5  do all the time in the educational context.  If there is a

6  right, then sure, that right would need to be taken account of,

7  but there is no right.  There is no child right to privacy

8  against their parents.

9           THE COURT:  Okay.  How is your client's First

10  Amendment right implicated in this case when the District has

11  taken no action to physically separate your client from her

12  child or prevent them from talking?  Cite the primary cases

13  where this right has been recognized.

14           MR. DIXON:  Your Honor, we cited several cases in our

15  brief.  I'll go through them briefly, but the *Gruenke* case out

16  of the Third Circuit -- I'm not sure I'm pronouncing that

17  correctly by the way -- in that case the child, the child was

18  pregnant, high schooler got pregnant.  The swim coach

19  interjected in what the Third Circuit called the "management of

20  family crisis."  There was no strict interference with the

21  ability of the parents to commune with the child.  It was

22  simply the interjections of the State into the family.

23           The Ninth Circuit case law states that what is

24  prohibited by the right to family integrity is unwarranted

25  interference into the parent-child relationship.  That's

1    precisely what was at issue in *Gruenke*, that is precisely what

2    is at issue here.

3         The *Arnold* case out of the Eleventh Circuit involved

4    a --

5         THE COURT:  So the interference occurs by the District

6    not taking any action, that's your argument by "not

7    disclosing," by not acting.

8         MR. DIXON:  By reaching down into the family and

9    socially transitioning a child in an area where the parent

10   should have control and authority over how the child

11   identifies, yes, that's exactly right, Your Honor.

12        THE COURT:  That's the interference you are talking

13   about?

14        MR. DIXON:  Yes, Your Honor.  We basically allege

15   there are three types of interference, taking an act that

16   interferes with that type of personal decision.

17        THE COURT:  What is an "interference" here?  It's

18   simply the District didn't tell your client, that's the only

19   "interference" in quotes.  I'm sorry, I'm using air quotes.

20        MR. DIXON:  The District is performing an act that

21   results in the child having more likely to have a transgender

22   identity for the rest of their life.

23        THE COURT:  The District is social transitioning the

24   child, but where is the interference?  Your argument of the

25   interference is they didn't tell my client; they didn't act.

1     MR. DIXON:  They performed that act without parental

2  consent, without the authority from the parent who has the

3  right to direct and control to do so.

4     THE COURT:  Okay.

5     MR. DIXON:  By doing so they also create a paradigm

6  where the parent or the child sees the parent as the enemy.

7  They go to school and they can -- the school will give them

8  what they want, but the parents won't give them what they want.

9  It creates a paradigm where they're the enemy, and it creates a

10  situation where the parent doesn't even know the influences

11  that are being imposed on the child.

12     THE COURT:  If I don't accept your argument that

13  the -- that one of the basis for this policy is that the

14  District views it as preventing child abuse, that, again, it's

15  really to protect the child as much as possible from harassment

16  at school, if I don't accept that argument, again, where is the

17  interference; where is the constitutional violation here?

18     MR. DIXON:  The District is performing actions on the

19  child that result in a issue that is core to the parent-child

20  relationship.  The child is the son or the child is the

21  daughter, the District is interfering with that creating --

22     THE COURT:  How?

23     MR. DIXON:  By socially transitioning the child which

24  results in a decreased rate of --

25     THE COURT:  But they're not taking the child away from

1   the parent.  The child goes home everyday.  The child is with

2   the parent 16 hours of the day.  That's not being interfered

3   with at all.

4           MR. DIXON:  Right, so --

5           THE COURT:  They're not physically separating the

6   child.  They're not preventing the child from talking to their

7   parent.  That's not in the policy.

8           MR. DIXON:  I would submit, Your Honor, that those

9   types of things, while sufficient, are not necessary to state a

10  claim for violation of the right to family integrity.  I

11  started talk about the *Gruenke* case, the *Arnold* case, there is

12  the *Patel* case.  In the *Patel* case, the police performed an

13  aggressive investigation and caused other family members to

14  distrust the plaintiff.  Second Circuit said that that type of

15  interference with the relationship of the family is sufficient

16  to state a claim for violation of family integrity.  While it

17  is true that most of the cases result in the Ninth Circuit

18  involve physical interference, the taking of a child, that is

19  certainly not the limit of the types of cases that will satisfy

20  the family integrity.

21          There are also District of Arizona and Central

22  District of California cases, we cited these in our brief

23  where -- go ahead, Your Honor.

24          THE COURT:  I'm asking a lot of questions.  Last one,

25  I promise.  One more question.  How does your client's request

1  for relief work with the District's general antidiscrimination

2  policy?

3         If the school abides by a parent's request to not

4  socially transition their child against the child's wishes,

5  isn't the school then in violation of its own

6  antidiscrimination policies?

7         MR. DIXON:  It's not, Your Honor, and the reason is

8  that the definition of who is transgender and who is not is a

9  parental decision.  So the District can apply its general

10  policies without problem.  It's just that the parent is the

11  entity, the person, whomever, who gets to decide that question.

12         THE COURT:  Okay.  Mr. Duus, question for you:  Under

13  this policy, or any policies, is the school -- in the Chico

14  Unified School District, is the school authorized to provide

15  any medical treatment to children absent parental notification

16  and/or consent, and if so, are there any limitations to this

17  authority?

18         MR. DUUS:  Not to my knowledge, Your Honor.

19         THE COURT:  Okay.  Are you aware of any?

20         MR. DIXON:  I am not Your Honor.

21         THE COURT:  Okay.

22         MR. DIXON:  I'm sorry, Your Honor, you're asking about

23  statutory?

24         THE COURT:  Do you know of any situation where a

25  school is authorized to provide medical treatment without

1    parental notification?

2            MR. DIXON:  No, Your Honor.

3            THE COURT:  Okay.  Don't take anything by the fact

4    that I picked on you a lot more.  It's the nature of my oral

5    arguments, and it doesn't reflect ultimately what I'm going to

6    decide.

7            I appreciate you doing your best to really respond.  I

8    know I put you on the hot spot a lot.  Take nothing from the

9    fact that I kind of let the defendant off the hook a little

10   bit.  Don't read anything into that.  I'll let you -- I don't

11   want you to repeat what's in the briefs, I've read the briefs,

12   and I have a lot to think about.  If there's anything else you

13   want on the record, I'll give each of you an opportunity to

14   sort of sum up.

15           I'm going to take the motion under submission.  I

16   think you deserve a written order, a written opinion in this

17   case.

18           It's a really unique issue, and I think it's

19   important.  I know there are other, again, districts dealing

20   with this issue in California, slightly different cases, but

21   it's going to keep coming up, so I think we need a written

22   order.  We'll get that out as soon as possible.

23           Mr. Dixon, go ahead.

24           MR. DIXON:  Yes, Your Honor.  I just want to stay

25   under the hotspot for one minute, Your Honor.  Not so much a

1   summary as it is really to just address one of the first things

2   that Your Honor said which is the standard here, the District

3   shocks the conscience; the District's actions shocks the

4   conscience.

5        We've explained that in our brief, Your Honor, that

6   shocks the conscience, which was at issue in the *Brittain* case,

7   arises in cases of executive action.  That's what the Supreme

8   Court said in the *Lewis* case.  And *Lewis* was a high speed

9   police chase that resulted in death.  In *Brittain* it was an

10  aggressive police investigation.

11       Here, that's not the right standard.  The right

12  standard here is the strict scrutiny standard, and the reason

13  is that we're challenging the prospective application of a

14  policy.  Under the *Lewis* test that is not an aggressive -- I'm

15  sorry, not an executive action, that's a legislative act for

16  purposes of the standard of review.

17       THE COURT:  You said prospective application of the

18  what?

19       MR. DIXON:  The policy, the parental secrecy.

20       THE COURT:  Would you agree strict scrutiny applies

21  again if I think there is a clearly established constitutional

22  right at issue here?

23       MR. DIXON:  The language of "clearly establish" sounds

24  a lot to me like qualified immunity.  So I'm not sure that's

25  the right standard.  I do recognize the *Glucksberg*.  I've read

1    *Glucksberg*, and I understand what it says.  Our argument is

2    twofold with respect to that.  I'm not going to repeat what

3    I've already said, but the Glucksberg test is satisfied, but I

4    would also point out that the Ninth Circuit has said that the

5    First Amendment right is coordinate with the Fourteenth

6    Amendment right, and there is no requirement for satisfying the

7    *Glucksberg* test for First Amendment claims.

8            THE COURT:  The other way, what you are arguing is

9    that you actually disagree that it's a rational basis review;

10    it's strict scrutiny as far as you're concerned.

11            MR. DIXON:  It's absolutely strict scrutiny, Your

12    Honor.  We believe we satisfy a rational basis, but rational

13    basis doesn't apply.

14            THE COURT:  Okay.

15            MR. DIXON:  Just to make the point very clear because

16    I want to clarify something Mr. Duus said about legislative

17    enactment.  This is a policy, we're challenging the prospective

18    application of it.  That warrants the application of strict

19    scrutiny because this is not an executive action.

20    Shocks-the-conscience test doesn't apply, but it is a

21    legislative enactment that creates an established state

22    procedure that results in the deprivation of a constitutionally

23    protected interest.

24            So for purposes of the procedural due process clause,

25    it doesn't fall under the rule.  You have *Bi-Metallic* or the

1   *Halverson* case that the District cited in its brief because

2   there is an adjudication that's occurring that results in the

3   deprivation of the right at the time of child is socially

4   transitioned without parental notice and an opportunity to be

5   heard.

6           THE COURT:  Mr. Duus, anything further you want to

7   add?

8           MR. DUUS:  Yeah, Your Honor.  Actually, it's "Duus."

9           THE COURT:  "Duus," sorry.

10          MR. DUUS:  That's okay.  I think just two things I

11  want to briefly touch on.  I think one of the ironies of this

12  case is that Ms. Regino ultimately found out that her daughter

13  was having these feelings about gender expression because the

14  daughter told the counselor, and the counselor, in their own

15  allegations, encouraged her to tell other family members, which

16  the young lady had to know the grandmother was going to tell

17  the mother.

18          Then, the second thing is, as I touched on at the

19  beginning of the hearing, and Your Honor mentioned at one point

20  about a Federal District Court such as this one, or another

21  District Court intruding into the parent-child relationship,

22  and what they're asking for, it's a huge step.  I mean, they're

23  asking this Court to recognize a significant expansion of the

24  Fourteenth Amendment and they can't.  They can't plausibly

25  argue that it's only going to effect transgender issues.  You

1     can't.  It's just not logical.  You know, once a right is

2     recognized, it expands.  There is no other way to go about it.

3          I would really -- if the Court were inclined to do

4     that, I would really want Mr. Dixon's answer to the question if

5     a parent can stop the gender transition of a child, can a

6     parent compel it?  That's funny, right, that would never

7     happen.  Really?  You have parents who want a boy, who want a

8     girl, there's ambiguity in the biological organs of the child,

9     if there's some other issues in how the child acts or if a

10    father with three girls wants a boy under the Constitution,

11    does that parent have the right to compel that child to gender

12    transition?  It's a converse argument, but it's just as

13    constitutionally sound if the Court recognizes the right

14    they're seeking.

15         MR. DIXON:  I'll be happy to respond, Your Honor.

16         THE COURT:  Go ahead.

17         MR. DIXON:  Our argument, the parental right is

18    triggered and the parental right here does not satisfy strict

19    scrutiny.  Parents have the right to direct and control the

20    gender identity of their children.  In the case where the

21    father wants a boy he could play basketball with, whatever the

22    case may be, the parental right is triggered.  Strict scrutiny

23    would clearly prohibit the father for transitioning the child

24    for that reason.  It's not really a very difficult

25    hypothetical.

1          I would also point out in my mind, if Montana, say,

2     were to enact the law that says parents may not socially

3     transition their children, even putting aside whether or not it

4     constitutes medical treatment, the Ninth Circuit unequivocally

5     would hold that that interferes with the parental right.

6          Your Honor didn't ask about the *Fields* and the *Barr*

7     line of cases.  I would simply like to close my argument by

8     saying that when parents hand their children off to the school,

9     the school stands in loco parentis.  In loco parentis, as we

10     cited in the *Gruenke* case, does not mean in place of parents.

11     Parents hand their kids off to school for the sole purpose of

12     the school to educate the children, and the school stands in

13     that position to the extent of that delegation.  That's why

14     *Fields* make sense, because schools have to have the ability to

15     have school curriculum.  That's why *Barr* makes sense because

16     schools have to have routine management decisions, hour of the

17     schoolday, that kind of thing.

18          When parents hand their kids off to school, they do

19     not hand them off for purposes of making gender identity, and

20     facilitating that -- maybe a better way to put it is

21     facilitating the transition of the gender identity.  That is

22     not within the scope of what the children are being handed off

23     to the school for.

24          THE COURT:  But you know the response to that argument

25     is that the school didn't do that here.  The school didn't make

1    the decision.  Her daughter had already made that decision.

2    Again, we're coming full circle.

3          I don't want to belabor the point.  I have a quick

4    question, it doesn't really apply to the motion to dismiss.  I

5    think we talked a little bit about it in terms of the remedy,

6    ultimate remedy your client is seeking.

7          She wants injunctive relief, right, she wants -- she

8    wants not only an order that the District can't enforce this

9    policy against her daughters, but that she also wants the Court

10   to go further and say the District has to rewrite the policy.

11   In fact, the District has to notify the parent before any

12   social transitioning takes place; is that accurate?  That's

13   what she wants out of this case, it's not really a monetary

14   case.

15         MR. DIXON:  As presently styled, it is not a monetary

16   case.  It is a declaratory and injunctive relief, and she would

17   like a declaration that the policy is constitutionally invalid,

18   that the District may not apply the policy as to her, and

19   separately may not apply the policy district wide.  I mean,

20   that's the facial challenge, is a declaration and injunction

21   vis-a-vis application of the policy writ large.

22         THE COURT:  But within that, that means the District

23   would have to notify her before any social transitioning took

24   place.

25         MR. DIXON:  That would not necessarily be the scope of

1    the Judge's order, Your Honor's order.  It certainly could be,

2    but we're asking for an injunctive and a declaration, this

3    policy.

4          THE COURT:  I'm just trying to get an idea if I ask

5    you to draft the injunction that you are seeking, would it

6    include an affirmative statement that the District has to

7    notify her -- it's not a class action, but notify her before

8    any social transitioning takes place and you would have to

9    define "social transition"?

10         MR. DIXON:  That would be the fullest extent of the

11    relief we would seek.  We would seek secondarily notice.  First

12    of all, notice and consent.  Second of all, lease notice.

13         THE COURT:  Okay.  Thank you, both.  Mr. Duus, sorry

14    for mispronouncing your name, but it will look fine on the

15    transcript.

16         Mr. Dixon, thank you.

17         Ms. Regino, thank you for being here.  It's important

18    that we have you here.  So I appreciate you being here as well.

19         We'll get something out to you as soon as we can.  We

20    are adjourned.

21      (Proceedings adjourned at 3:03 p.m.)

22

23

24

25

1              C E R T I F I C A T E

2

3        I certify that the foregoing is a true and correct

4   transcript of proceedings in the above-entitled matter.

5

6

7   MARYANN VALENOTI, RMR, CRR              August 6, 2023
    Official Court Reporter                      DATE
8   CA CSR #11266

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275