1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   AURORA REGINO,                          No. 2:23-cv-00032-DJC-DMC

12              Plaintiff,

13        v.                                  ORDER

14
     SUPERINTENDENT GREG BLAKE, in
15   his official capacity as Superintendent
     of the Chico Unified School District,
16
17              Defendant.

18

19        This case concerns Chico Unified School District's Policy regarding how to

20   handle the situation where a student expresses a desire to use a different name and

21   pronouns that do not align with the student's sex at birth.  Subject to certain

22   exceptions not relevant here, the school will generally defer to the student's request

23   to use the name and pronouns of their choosing.  Significantly for this case, the school

24   district treats this information as confidential – including from parents – unless the

25   student consents or disclosure is otherwise required by law.

26        Plaintiff is the parent of two students who attend schools in the Chico Unified

27   School District.  Her elder daughter previously requested to use a "boy name" and

28

                                         1

1   male pronouns at school, and the Plaintiff is concerned that under the District's Policy,

2   one of her children could again make a similar request and she would not be

3   informed.  In her Second Amended Complaint, she brings claims under the First and

4   Fourteenth Amendment arguing that the District's Policy is unconstitutional to the

5   extent it deprives her of the ability to withhold consent to the school using different

6   names and pronouns to refer to her children.

7        The Court is well aware of the ongoing societal debate about how to best

8   respond to children who may identify as transgender.  Parents understandably want to

9   know if their child is struggling with their gender identity, and many will be supportive

10  of their children as they explore this aspect of themselves.  And schools,

11  understandably, have an interest in ensuring that they remain a safe space in which

12  students can explore their identities, as children do in myriad ways in the school

13  environment.  Where to draw that line, however, is not for this Court to resolve.  Nor is

14  the wisdom of the District's Policy.  The much more limited question presented by the

15  School District's Motion to Dismiss is whether the United States Constitution has

16  anything to say on the matter.  The Court concludes it does not.

17       While Plaintiff alleges a constitutional right to consent before the School District

18  uses different names and pronouns, no such right exists.  Primarily, Plaintiff attempts

19  to cast the School District's Policy as about the provision of a medical treatment, which

20  Plaintiff refers to as "social transitioning."  While the Court has no doubt that the use of

21  names and pronouns can be a part of treatment for gender dysphoria when

22  implemented as part of a broader treatment plan by licensed medical professionals, a

23  school's decision to use a student's preferred name and pronouns, standing alone, is

24  not medical treatment, and does not implicate caselaw giving parents a constitutional

25  right to consent to medical treatment on behalf of their children.  Plaintiff's alternative

26  arguments – that the School District's Policy implicates a fundamental right to consent

27  when the state makes important decisions in a child's life, maintain the integrity of the

28

1  family, and to name children – lacks support in this nation's history and tradition.

2  Accordingly, the Court will GRANT the Defendant's Motion to Dismiss.

3                              **BACKGROUND**

4  **I.      Factual Background**

5          Plaintiff Aurora Regino brings suit against Defendant Greg Blake,

6  Superintendent of the Chico United Schools District, alleging that the implementation

7  of the Administrative Regulation 5145.3 ("the Policy") violates parental rights under

8  the First and Fourteenth Amendments of the United States Constitution.  The facts are

9  largely known to the Parties.  (*See* ECF No. 57) at 2–4); *Regino v. Staley,* 133 F.4th 951,

10  956–59 (9th Cir. 2025).   Nevertheless, the Court summarizes the operative allegations

11  here.

12          On its face, the Policy reads as a measure concerning nondiscrimination and

13  anti-harassment and includes a subsection discussing policies related to transgender

14  and gender non-conforming students.  (*See* Policy (ECF No. 88-3, Ex. C); Mot. Dismiss

15  (ECF No. 88) at 11–12.)  Under the Policy, the District prohibits "[r]efusing to address a

16  student by a name and the pronouns consistent with the student's gender identity[,]"

17  and "[r]evealing a student's transgender status to individuals who do not have a

18  legitimate need for the information, without the student's consent[.]"  (Policy at 5.)

19  Additionally, the Policy directs District personnel to address situations involving

20  transgender and gender non-conforming students, on a "case-by-case basis, in

21  accordance with [certain] guidelines[.]"  (*Id.*)  These guidelines include a "[r]ight to

22  privacy" wherein the "student's transgender or gender-nonconforming status is the

23  student's private information and the district shall only disclose the information to

24  others with the student's prior written consent[.]"  (*Id.*)  This right to privacy exists

25  "except when the disclosure is otherwise required by law or when the district has

26  compelling evidence that disclosure is necessary to preserve the student's physical or

27  mental well-being."  (*Id.*)

28

1    Plaintiff's child, A.S., was an eleven-year-old, fifth grade student who attended

2    Sierra View Elementary School in the District.  (*Id.* ¶¶ 55, 56.)  In fall 2021, A.S. began

3    to feel depressed and anxious following significant changes to her home life.  (*See*

4    *id.* ¶ 56.)  Plaintiff alleges that a school counselor visited A.S.'s class on a regular basis

5    to remind students of the school's counseling services.  (*Id.* ¶ 57.)  In December 2021,

6    A.S. began to feel "like she was a boy", and met with the counselor to discuss her

7    feelings of anxiety and depression but did not mention that she felt like a boy.

8    (*Id.* ¶¶ 59, 60.)  At the advice of the counselor, and with Plaintiff's permission, A.S.

9    joined a school-run "Girls Group" led by the counselor that would be focused mostly

10   on arts with a small group of girls.  (*Id.* ¶¶ 60, 61.)

11   In January 2022, A.S. informed the school counselor that "she felt like a boy"

12   and after being asked, said she wanted to be called "J.S." and use male-identifying

13   pronouns.  (*Id.* ¶ 63.)  A.S. told the counselor that she did not want her mother to

14   know, because she was worried that her mother would be "mad."  (*Id.*)  "[T]he

15   counselor did not discuss A.S.'s feelings of anxiety or depression, nor did she attempt

16   to understand the reason(s) behind A.S.'s supposed transgender identity."  (*Id.* ¶ 64.)

17   As required by the Policy, school personnel referred to A.S. as "J.S." and with male

18   pronouns.  (*Id.* ¶ 65.)  Following A.S.'s request, Plaintiff alleges that the topics of the

19   Girls Group changed to discussions regarding gender identity.  (*Id.* ¶ 67.)  Plaintiff also

20   alleges that the counselor "was not supportive of" A.S. telling her mother about her

21   new identity by "brush[ing] off" her "request" and instead telling "her that if she

22   wanted to 'come out' to her family, she should notify other family members first."  (*Id.*

23   ¶ 69.)  In 2022, A.S. informed her grandmother about her new identity, and A.S.'s

24   grandmother informed Plaintiff.  (*Id.* ¶¶ 72, 73.)  Plaintiff was unaware of A.S.'s new

25   identity and contends that Defendant "socially transitioned" Plaintiff's child without

26   Plaintiff's consent and "kept its actions secret" from Plaintiff based on A.S.'s statement

27   that A.S. did not want Plaintiff to know.  (*Id.* ¶ 7.)  The following school year, A.S.

28   began using the name "A.S." again and female-identifying pronouns.  (*Id.* ¶ 77.)

1  Plaintiff is nevertheless concerned that the school may "socially transition" A.S. or

2  Plaintiff's other child, C.S., without Plaintiff's consent or notice.  (*See id.* ¶¶ 78–92.)  In

3  the SAC, Plaintiff includes a series of studies to support her claims about healthcare

4  treatment.  (*Id.* ¶ 18.)

5        Plaintiff now brings six causes of action under 42 U.S.C. § 1983 alleging

6  violations of the First and Fourteenth Amendments to the United States Constitution

7  all premised on parental rights arguments.  These are: (1) a facial First Amendment

8  challenge; (2) an as-applied First Amendment challenge; (3) a facial Fourteenth

9  Amendment substantive due process challenge; (4) an as-applied Fourteenth

10  Amendment substantive due process challenge; (5) a facial Fourteenth Amendment

11  procedural due process challenge; and (6) an as-applied Fourteenth Amendment

12  procedural due process challenge.  Defendant seeks to dismiss the action alleging

13  that Plaintiff has failed to plausibly state claims upon which relief can be granted.  The

14  matter is fully briefed (Opp'n (ECF No. 90); Reply (ECF No. 93)) and was ordered

15  submitted following oral argument.

16      **II.    Procedural Background**

17        In January 2023, Plaintiff filed her initial Complaint (ECF No. 1) and Motions for

18  Preliminary Injunction (ECF Nos. 2, 18).  The Motions for Preliminary Injunction were

19  denied (ECF Nos. 11, 37) and Plaintiff proceeded to file a First Amended Complaint

20  (ECF No. 42).  Defendant then filed a motion to dismiss Plaintiff's First Amended

21  Complaint, which was granted with prejudice, because Plaintiff failed to allege the

22  existence of a fundamental right that was clearly established in existing precedent.

23  (ECF No. 57.)  Plaintiff appealed the decision to the Ninth Circuit, (ECF No. 59) which

24  vacated the district court's order and remanded the case (ECF No. 70).  The Ninth

25  Circuit held that erroneous legal standards were applied to the substantive and

26  procedural due process claims, and that the distinction between Plaintiff's facial and

27  as-applied challenges was not addressed.  *Regino v. Staley,* 133 F.4th 951, 962, 967

28

1  (9th Cir. 2025).  The case was then reassigned to this Court (ECF No. 72), which now

2  assesses Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint.

3  <center>**LEGAL STANDARD**</center>

4  A party may move to dismiss for "failure to state a claim upon which relief can

5  be granted[.]"  Fed. R. Civ. P. 12(b)(6).  The motion may be granted only if "the

6  complaint lacks a cognizable legal theory or sufficient facts to support a cognizable

7  legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.,* 521 F.3d 1097, 1104 (9th Cir.

8  2008).  While the court assumes all factual allegations are true and construes "them in

9  the light most favorable to the nonmoving party," *Steinle v. City & Cnty. of S.F.,* 919

10  F.3d 1154, 1160 (9th Cir. 2019), if the complaint's allegations do not "plausibly give

11  rise to an entitlement to relief" the motion must be granted.  *Ashcroft v. Iqbal,* 556 U.S.

12  662, 679 (2009).

13  A complaint need contain only "a short and plain statement of the claim

14  showing that the pleader is entitled to relief[,]" Fed. R. Civ. P. 8(a)(2), not "detailed

15  factual allegations." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007).  However,

16  this rule demands more than unadorned accusations; "sufficient factual matter" must

17  make the claim at least plausible.  *Iqbal,* 556 U.S. at 678.  In the same vein, conclusory

18  or formulaic recitations of elements do not alone suffice.  *Id.*  "A claim has facial

19  plausibility when the plaintiff pleads factual content that allows the court to draw the

20  reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

21  (citation omitted).

22  <center>**REQUEST FOR JUDICIAL NOTICE**</center>

23  Both Parties submitted Requests for Judicial Notice (ECF Nos. 88-3, 92.)

24  Plaintiff opposes Defendant's Request for Judicial Notice in part.  (ECF No. 91.)  A

25  district court may take judicial notice of "a fact that is not subject to reasonable

26  dispute because. . . it can be accurately and readily determined from sources whose

27  accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).

28

<center>6</center>

1    Defendant's Request involves three exhibits: Exhibit A – "Frequently Asked

2    Questions: School Success and Opportunity Act (Assembly Bill 1266) Frequently

3    Asked Questions"; Exhibit B – "California School Boards Association ("CSBA") sample

4    'Regulation 5145.3"; and Exhibit C – Administrative Regulation 5145.3." (ECF No. 88-

5    3). Plaintiff opposes Defendant's request as it relates to Exhibits A and B. Because the

6    Court need not rely on Exhibits A and B in determining the instant Motion, the Court

7    DENIES Defendant's request as to Exhibits A and B, and GRANTS the request as to

8    Exhibit C. *See Khoja v. Orexigen Therapeutics, Inc.,* 899 F.3d 988, 999 (9th Cir. 2018)

9    (explaining that courts may take judicial notice of matters of public record); *Lifeway*

10    *Foods Inc. v. Millenium Products, Inc.,* No. 16-cv-7009-R, 2016 WL 7336721, at *1 (C.D.

11    Cal. Dec. 14, 2016) (explaining that publicly available government records are

12    commonly subject to judicial notice).

13    Plaintiff also requests judicial notice of three exhibits: Exhibit A – Administrative

14    Regulation #6153 concerning the District's school trip policy; Exhibit B –

15    Administrative Regulation #5141.21 concerning administering health medication to

16    students; Exhibit C – #5141.32 concerning the policy on health screenings of students

17    for school entry. (ECF No. 92). For the same reasons the Court granted Defendant's

18    request as to its Exhibit C, the Court GRANTS Plaintiff's Request.

19                                    **DISCUSSION**

20    Plaintiff brings six causes of action against Defendant pursuant to 42 U.S.C.

21    § 1983 alleging that the Policy infringes on constitutionally protected parental rights

22    and rights of familial association. Plaintiff raises both facial and as-applied challenges.

23    "[A] facial challenge is a challenge to an entire legislative enactment or provision."

24    *Hoye v. City of Oakland,* 653 F.3d 835, 857 (9th Cir. 2011). However, an as-applied

25    challenge "contends that the law is unconstitutional as applied to the litigant's

26    particular [circumstances], even though the law may be capable of valid application to

27    others." *Foti v. City of Menlo Park,* 146 F.3d 629, 635 (9th Cir. 1998).

28

1    To state a claim for relief in an action under section 1983, plaintiffs must show

2  that (1) "they were deprived of a right secured by the Constitution or laws of the

3  United States" and (2) "the alleged deprivation was committed under color of state

4  law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50 (1999).  Defendant

5  contends that Plaintiff has failed to state any claim upon which relief can be granted

6  because legislative policy accepting the preferred name and pronouns of a

7  transgender student (1) does not constitute medical treatment because the decision

8  has not been made in connection with a medical plan and requires no specialized

9  skill; (2) does not interfere with a parent's familial relationship because it does not

10  affect how parents, themselves, interact with the child; and (3) does not violate

11  parents' rights because the Constitution does not afford parents the authority to

12  compel state action.

13  **I.    Substantive Due Process Claims**

14    The Fourteenth Amendment's Due Process Clause prohibits states from

15  depriving any person of life, liberty, or property, without due process of law.  U.S.

16  Const. Amend. XIV, § 1.  Rooted within the Due Process Clause's concept of "liberty"

17  are certain fundamental rights and liberty interests that are protected from state

18  action, *Washington v. Glucksberg,* 521 U.S. 702, 719–20 (1997) (citations omitted),

19  unless the government "infringement is narrowly tailored to serve a compelling state

20  interest," *Reno v. Flores,* 507 U.S. 292, 302 (1993).  Where a law does not infringe on a

21  fundamental right, the law need only be "rationally related to legitimate government

22  interests."  *Stormans, Inc. v. Wiesman,* 794 F.3d 1064, 1085 (9th Cir. 2015) (quoting

23  *Glucksberg,* 521 U.S. at 728).  The Supreme Court has repeatedly instructed courts "to

24  exercise the utmost care" before breaking new ground in the area of unenumerated

25  fundamental rights.  *Regino,* 133 F.4th at 960 (citing *Khachatryan v. Blinken,* 4 F.4th

26  841, 856 (9th Cir. 2021) (alteration accepted) (quoting *Collins v. City of Harker Heights,*

27  503 U.S. 115, 125) (1992)).  As such, new fundamental rights must "be defined in a

28

1    most circumscribed manner, with central reference to specific historical practices." *Id.*

2    (citing *Khatchatryan,* 4 F.4th at 856 (citation omitted)).

3    In its decision on appeal, the Ninth Circuit instructed this Court to consider

4    whether Plaintiff has alleged the infringement of a fundamental right by employing the

5    "established method of substantive due process analysis." *Id.* at 964 (citing

6    *Glucksberg,* 521 U.S. at 720). This analysis is to proceed by "carefully formulating" the

7    asserted fundamental right and considering whether the asserted right itself, or one in

8    which it is encompassed, is "objectively, deeply rooted in this Nation's history and

9    tradition and implicit in the concept of ordered liberty, such that neither liberty nor

10   justice would exist if [it was] sacrificed." *Id.* at 960 (citations omitted). The Ninth

11   Circuit further noted that neither party had previously articulated a position that was

12   supported by precedent. *Id.* at 965.

13   **A. Executive Action vs. Legislative Action**

14   The Supreme Court has applied two different legal standards to substantive

15   due process claims: the fundamental rights analysis, and the shocks the conscience

16   standard. *See Martinez v. City of Oxnard,* 337 F.3d 1091,1092 (9th Cir. 2003) (per

17   curiam). In its decision on appeal, the Ninth Circuit acknowledged that these are the

18   two standards of review, but applied only the fundamental rights analysis as that was

19   the theory under which Plaintiff asserted her claims. *Regino,* 133 F.4th at 960 n.5. The

20   court further stated that it expressed no opinion on the shocks the conscience

21   standard's applicability here. *Id.*

22   In his Motion, Defendant contends that the shocks the conscience standard

23   governs Plaintiff's as-applied substantive due process claim. (Mot. Dismiss at 28–29.)

24   Specifically, Defendant points to a distinction between "executive acts" and

25   "legislative acts" wherein the former are often analyzed under the shocks the

26   conscience standard, and the latter is subjected to a fundamental rights analysis. (*Id.*

27   at 27.) An executive act typically arises "from the ministerial or administrative activities

28   of members of the executive branch," *McKinney v. Pate,* 20 F.3d 1550, 1557 n.9 (11th

1  Cir. 1994), and generally concern "a specific act of a governmental officer that is at

2  issue," *County of Sacramento v. Lewis,* 523 U.S. 833, 846 (1998).  A legislative act

3  "generally appl[ies] to a larger segment of – if not all – society[.]"  *Id.* at 846.  An

4  administrative regulation and executive order, while executive in nature, may be

5  classified as legislative when broadly applicable.

6       Defendant argues that Plaintiff's as-applied claim involves an executive act,

7  because the challenge concerns the application of the Policy to her as a "specific, one-

8  time circumstance."  (Mot. Dismiss at 27–28.)  Plaintiff's SAC advances arguments only

9  under the fundamental rights analysis and states that the fundamental rights analysis is

10  applicable here to the as-applied challenge.  (Opp'n at 18.)  The Court finds that

11  because Plaintiff here primarily targets the contents of the Policy, rather than the

12  district's conduct in its application of the Policy to Plaintiff's child, the action being

13  targeted here is legislative in nature.  As such, the shocks the conscience standard

14  does not apply.

15       **B.  Formulations of the Right**

16       As directed by the Ninth Circuit, the Court begins by "carefully formulating" the

17  fundamental right at issue.[1]  *Regino,* 133 F.4th at 964 (citing *Glucksberg,* 521 U.S. at

18  722).  The Supreme Court has emphasized the need to be "precise" in asserting the

19  fundamental right at issue.  *Glucksberg,* 521 U.S. at 723; *see, e.g., Cruzan ex rel.*

20  *Cruzan v. Dir. Mo. Dep't of Health,* 497 U.S. 261, 277–79 (1990) (identifying the

21  "constitutionally protected right to refuse lifesaving hydration and nutrition" rather

22  than a more generic "right to die").  Thus, the Court will "eschew sweeping

23  generalizations" and consider "the scope of the challenged regulation and the nature

24  of Plaintiff's allegations."  *Regino,* 133 F.4th at 964–65 (citations omitted).

25  _____

26  [1] Plaintiff brings claims under both the First Amendment and the Due Process Clause of the Fourteenth
    Amendment.  Given that the First Amendment claims are all related to an alleged right to family

27  association, the Court concludes, as did the Ninth Circuit, that "Regino's familial association claims
    under the First Amendment are entirely subsumed within her familial association claims premised on

28  substantive due process."  *Regino,* 133 F.4th at 961 n.6.

1  In reviewing the SAC and the briefing in the Motion to Dismiss, Plaintiff asserts

2  that she has a fundamental right to "make decisions concerning the care, custody, and

3  control" of her children under *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality op.).

4  As the Ninth Circuit recognized, however, the broad formulation of parental rights that

5  has been utilized in some decisions come with "important limitations," *Regino*, 133

6  F.4th at 963.  Moreover, as the Ninth Circuit cautioned, the "Supreme Court has

7  repeatedly rejected broad formulations of asserted fundamental rights, in favor of

8  being 'more precise.'" *Id*. at 964 (quoting *Glucksberg*, 521 U.S. at 723).  While there

9  are some inconsistencies between the allegations in the SAC and Plaintiff's

10  Opposition to the Motion to Dismiss, in reviewing both, it appears that Plaintiff has

11  alleged the following as fundamental rights that are infringed by Defendant's policies:

12  • The right to consent when the state seeks to provide healthcare
13    treatment to a child.  (SAC ¶ 115; Opp'n at 6.)

14  • The right to consent when the state makes important decisions in their
15    child's life.  (SAC ¶ 116; Opp'n at 9.)

16  • The right to maintain the integrity of her family and to maintain a tight
17    familial bond.  (Opp'n at 11.)

18  • The right to name her children.  (Opp'n at 12.)

19  • The right to notice when the school seeks to "socially transition" a child.
20    (SAC ¶ 114; Opp'n at 13.) [2]

21  The Court will proceed to analyze each to determine if the right in question is

22  "objectively, deeply rooted in this Nation's history and tradition and implicit in the

23  concept of ordered liberty, such that neither liberty nor justice would exist if [it was]

24  sacrificed."  *Glucksberg,* 521 U.S. at 720–21 (cleaned up).  If it is, the Court will

25  determine if the particular right is implicated by the Defendant's Policy.

26
27  [2] While in the Court's view, this is better understood as a procedural due process right, see *Mueller v. Auker*, 576 F.3d 979, 997 (9th Cir. 2009) (cited by Plaintiff at Opp'n at 13), the Court will also address whether this is a substantive due process right in the interest of fully exploring all the bases on which

28  Plaintiff claims a substantive due process right.

**1. Right to Consent to Healthcare Treatment**

In the SAC, Plaintiff alleges that the Defendant's Policy amounts to "social transitioning" which is described as a "putatively therapeutic environment in which the minor's transgender identify is affirmed, thus putatively alleviating the minor's psychological distress associated with a mind-body mismatch through the affirmation of the minor's transgender identity." (SAC ¶ 32.) The Complaint further alleges that social transitioning "is a significant form of psychological treatment." (*Id.* ¶ 33.) Having alleged that the Defendant's Policy is effectively a form of psychological treatment, Plaintiff argues that the Policy violates a parent's right to consent to medical treatment on behalf of their child.

Plaintiff is correct that parents have a substantive due process right "to seek and follow medical advice" concerning one's children. *Parham v. J.R.,* 422 U.S. 584 (1979). Generally speaking, this recognized right "to seek and follow medical advice" appears to involve "intrusions upon the bodily integrity of the child or other conduct with clinical significance – whether through a medical procedure, examination, or hospitalization" by a state actor. *Foote v. Ludlow Sch. Comm.,* 128 F.4th 336, 349 (1st Cir. 2025); *see City of Huntington Beach v. Newsom,* 790 F. Supp. 3d 812, 831–32 (C.D. Cal. 2025) (citing *Parham v. J. R.*, 442 U.S. 584, 604 (1979) (recognizing parental right to have child committed to hospital for mental illness); *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1150 (9th Cir. 2021) (complaint sufficiently alleged violation of parental right to notice of medical exam of children, right to parental consent in advance of exam, and right to be present at exam, where exam included genital and anal inspection, urine and blood tests, and/or vaccinations); *Mann v. Cnty. of San Diego*, 907 F.3d 1154, 1161 (9th Cir. 2018) (county infringed on parental right to notice and consent to county conducting medical examinations on children, including gynecological and rectal exam and collecting blood and urine samples); *Greene v. Camreta*, 588 F.3d 1011, 1036–37 (9th Cir. 2009) (defendant violated familial rights for parents and children to be with each other during potentially traumatic medical

1   examinations absent a valid reason); *Wallis v. Spencer*, 202 F.3d 1126, 1141–42 (9th

2   Cir. 2000) (recognizing parental right to make important medical decisions and "be

3   with their children while they are receiving medical attention" in the context of

4   "invasive vaginal and anal medical examinations.").  Given that *Parham* involved the

5   commitment of a child to a state mental hospital, however, this right surely applies to

6   significant psychological treatment.

7          While Plaintiff has articulated a cognizable substantive due process right, the

8   Court concludes that Defendant's Policy does not implicate that right.  While the Court

9   must accept as true the factual allegations in the SAC, a "pleading that offers labels

10  and conclusions or a formulaic recitation of the elements of a cause of action will not

11  do." *Iqbal*, 556 U.S. at 678 (cleaned up).  In this case, simply because Plaintiff asserts

12  that utilizing a student's name and preferred pronouns constitutes medical treatment

13  does not make it so.  *See City of Huntington Beach,* 790 F. Supp. 3d at 830 (collecting

14  cases where courts have dismissed similar due process claims at the 12(b)(6) stage

15  where the alleged conduct does not plausibility constitute medical treatment).  While

16  the Court accepts as true the allegation that social transitioning "is a primary pillar of

17  the 'affirmation' model" of care for treating gender dysphoria (SAC ¶¶ 25, 32), it is

18  simply not plausible that acquiescing to a minor's request to use a particular name or

19  gender pronoun – without more – constitutes medical treatment.  *See City of*

20  *Huntington Beach*, 790 F. Supp. 3d at 830–32.

21         As to Plaintiff's facial challenge, nothing in the Policy requires that a minor have

22  a diagnosis of gender dysphoria in order for the Policy to apply.  Rather, school

23  officials "shall accept the student's assertion of his/her gender identity and begin to

24  treat the student consistent with that gender identity unless district personnel present

25  a credible and supportable basis for believing that the student's assertion is for an

26  improper purpose." (Policy at 6.)   No physician, mental health professional, or other

27  medical provider is involved in this determination.  Instead, it is ministerial in nature.

28

1    Nor does the Policy implicate healthcare treatment as it was applied to

2    Plaintiff's child.  While it may be that the "school counselor" to whom A.S. made her

3    initial request to use the name "J.S." and male pronouns was a mental health

4    professional (SAC ¶ 63), it is clear that the counselor did not make any diagnosis of

5    A.S. or consider using the male name and pronouns to constitute medical treatment.

6    In fact, the SAC affirmatively alleges that during the meeting at which the name and

7    pronouns were discussed, "the counselor did not discuss A.S.'s feelings of anxiety and

8    depression, nor did she attempt to understand the reason(s) behind A.S.'s supposed

9    transgender identity."  (*Id.* ¶ 64.)  There is no allegation that the use of a male name

10   and pronouns – made at A.S.'s request – was part of a larger treatment plan for

11   gender dysphoria or any other diagnosis.

12        This conclusion is in alignment with other courts that have addressed this issue.

13   In *Foote*, the First Circuit rejected a claim that a policy much like the one at issue in this

14   case implicated a parent's right to consent to medical treatment.  128 F.4th at 349–50.

15   The Court wrote that "we do not believe that using the Student's chosen name and

16   pronouns – something people routinely do with one another, and which requires no

17   special training, skill, medication or technology –without more, can be reasonably

18   viewed as evidencing some indicia of medicalization." *Id.* at 350.  Similarly in *City of*

19   *Huntington Beach*, the district court rejected a challenge to Assembly Bill 1955, which

20   prohibits disclosure of a student's gender identity unless otherwise required by state

21   or federal law.  *See* 790 F. Supp. 3d at 819–20.  The Court concluded that while social

22   transitioning could be "part of a broader care plan that also includes medical

23   treatments and procedures" it was not itself a medical treatment.  *Id.* at 829–30.

24        *Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019), cited by Plaintiff, is not to

25   the contrary.  If anything, it proves the point.  *Edmo* concerned whether prison officials

26   were deliberately indifferent in violation of the Eighth Amendment when they refused

27   to provide gender confirmation surgery to Edmo, a prison inmate.  *Id.* at 767, 772.  All

28   parties agreed that Edmo "suffer[ed] from gender dysphoria, a serious medical

14

1   condition." *Id*. at 767.  In considering the inmate's challenge to the prison's policy, the

2   Ninth Circuit conducted an exhaustive review of that diagnosis, as well as the standard

3   of care for treating it, standards which Plaintiff points to in support of her argument

4   that the Defendant's Policy constitutes medical treatment.  While it is true that

5   "changes in gender expression and role (which may involve living part time or full time

6   in another gender role, consistent with one's gender identity)" is one of the treatment

7   options for individuals with gender dysphoria, along with psychotherapy, hormone

8   therapy, and in some circumstances, surgery, *id*. at 770, such treatment is part of a

9   diagnosis of gender dysphoria.  That diagnosis requires "a marked incongruence

10  between one's experienced/expressed gender and assigned gender, of at least 6

11  months," plus two of six listed criteria, and also must be associated with "clinically

12  significant distress" that "impairs or severely limits the person's ability to function in a

13  meaningful way and has reached a threshold that requires medical or surgical

14  intervention, or both."  *Id*. at 768.  There is no such requirement, either facially or as

15  applied in this case, requiring such a medical diagnosis before a student is permitted

16  to use different pronouns or a different name.  While "social transitioning" may be part

17  of an approved treatment plan for individuals with gender dysphoria, using a

18  student's names and pronouns without any diagnosis or involvement of medical

19  professionals does not involve medical treatment, and nothing in *Edmo* suggests

20  otherwise.

21       While the district court in *Mirabelli v. Olson,* No. 3:23-cv-00768-BEN-WVG,

22  2025 WL 3713588 (S.D. Cal. Dec. 22, 2025) reached the opposite conclusion,[3] this

23  Court respectfully does not find that decision persuasive.  First, there is no careful

24  formulation of the fundamental right at issue as the court seems to couch the various

25  articulations in a broad parental right to make decisions about their children.  *See*

26

27  [3] The Ninth Circuit has stayed the district court's injunction pending appeal, in part concluding that the State had made a "strong showing that the district court likely erred in its substantive due process analysis."  *Mirabelli v. Bonta*, No. 25-8056, 2026 U.S. App. LEXIS 403, *11 (January 5, 2025).

28

1   *Regino,* 133 F.4th at 964.  Second, *Mirabelli* brushes off the defendant's argument that

2   the policies are not social transitioning, or even if they are, then it is not medical care –

3   referring to the debate as a "red herring."  2025 WL 3713588 at *8–11.[4]  This Court

4   disagrees.  Whether the policy constitutes a form of medical treatment is crucial to

5   determining whether it falls within the substantive due process right to consent to

6   medical treatment.  *See Regino*, 133 F.4th at 965 (instructing that "[a]fter formulating

7   the asserted fundamental right, the district court must consider whether the asserted

8   right itself, or one in which it is encompassed, is objectively, deeply rooted in this

9   Nation's history and tradition. . . ." (cleaned up)).

10        Finally, the Court observes that the implications of Plaintiff's arguments are far-

11  reaching.  As an initial matter, if social transitioning is really the provision of a mental

12  health treatment, it logically follows that the teachers and counselors engaging in it

13  are engaged in the illegal (and criminal) practice of healthcare without a license.  *See*

14  Cal. Bus. & Prof. Code §2052.  Moreover, there are many examples in which school

15  officials engage in conduct that could be considered medical treatment under

16  Plaintiff's theory.  Teachers, coaches, and other school officials often occupy a trusted

17  position with respect to children, who confide in them and seek their advice.  A

18  teacher may well use similar tools a therapist might in helping the student to handle

19  being bullied, for example, and adopting Plaintiff's logic would lead to the conclusion

20  that the teacher is providing mental health care.  Untethering components of mental

21  health treatment from a diagnosis and treatment plan developed by a mental health

---

22  [4] The *Mirabelli* court cites to a footnote in *Doe v. Horne*, which states that a "[t]he generally accepted
23  medical practice is to treat people who suffer from gender dysphoria with necessary, safe, and effective
     gender-affirming medical care."  115 F.4th 1083, 1107 n. 13 (9th Cir. 2024) (quotation marks and
24  citation omitted)).  As part of the medical treatment to alleviate gender dysphoria, treatment includes
     "one or more of the following components: (i) social transition, including adopting a new name,
25  pronouns, appearance, and clothing, and correcting identity documents; (ii) medical transition,
     including puberty-delaying medication and hormone-replacement therapy; and (iii) for adults,
26  surgeries to alter the appearance and functioning of primary-and secondary-sex characteristics."  *Id.*
     Importantly, "[f]or social transition to be clinically effective, it must be respected consistently across all
27  aspects of a transgender individual's life."  *Id.* (citation omitted).  The footnote in *Doe* further
     underscores this Court's point that using a student's names and pronouns – in a limited context – does
28  not in and of itself constitute healthcare treatment.

1  professional risks medicalizing a host of everyday interactions between children and

2  school officials.

3      Accepting Plaintiff's theory would also greatly expand the substantive due

4  process right to consent to medical treatment beyond any notion of history and

5  tradition.  As discussed above, all the cases involving a parental right to consent to

6  medical treatment have involved invasive medical treatment or psychological

7  treatment by a medical professional.  During the hearing on Defendant's Motion to

8  Dismiss, Plaintiff suggested that there might be some "constitutional" understanding

9  of medical treatment that is broader than the typical definition employed under state

10  law.  But Plaintiff points to no authority – and the Court is unaware of any – suggesting

11  that parents have a right to consent to some kind of broader conception of medical

12  treatment than that provided by a licensed medical professional.  Likewise, Plaintiff

13  has failed to meet her burden of establishing that such a right to consent to some

14  broader concept of healthcare is "objectively, deeply rooted in this Nation's history

15  and tradition, and implicit in the concept of ordered liberty, such that neither liberty

16  nor justice would exist if [it was] sacrificed."  *Regino*, 133 F.4th at 960 (quoting

17  *Khachatryan*, 4 F.4th at 858 (9th Cir. 2021) and *Glucksberg*, 521 U.S. at 729).  Rather,

18  this articulation of the right appears to be another way of articulating the claimed right

19  of parents to make important decisions in their children's lives, which the Court turns

20  to next.

21      In sum, the Defendant's Policy does not violate a parent's right to consent to

22  healthcare treatment.

23              **2.  Right to Make Important Decisions**

24      Plaintiff also asserts a "right to consent when the state makes 'important

25  decisions' in her children's lives . . . that is, those decisions that go to the 'heart of

26  parental decision-making.'"  (Opp'n at 9, quoting *H.L. v. Matheson*, 450 U.S. 398, 410

27  (1981) and *C.N. v. Ridgewood Bd. Of Educ.*, 430 F.3d 159, 184 (3d Cir. 2005).  Plaintiff

28  finds support for this fundamental right from decisions recognizing the ability of

1  parents to control child visitation, *Troxel*, 530 U.S. 57, whether to send children to

2  private school and the ability to have them taught in their chosen language, *Pierce v.*

3  *Society of Sisters*, 268 U.S. 510 (1925), *Meyer v. Nebraska*, 262 U.S. 390 (1923), the

4  ability to determine if children can go out in public at night, *Nunez by Nunez v. City of*

5  *San Diego*, 114 F.3d 935 (9th Cir. 1997), and the purported ability to decide whether

6  children may have access to birth control at school, *Matter of Alfonso v. Fernandez*,

7  195 A.D. 2d 46, 60 (N.Y. App. Div. 1993).[5]

8       The Supreme Court has long recognized the fundamental of parents to make

9  decisions concerning the care, custody and control of their children.  *Troxel*, 530 U.S.

10  at 65 ("The interest of parents in the care, custody, and control of their children . . . is

11  perhaps the oldest of the fundamental liberty interests recognized by this Court.").

12  This right is known as the *Meyer-Pierce* right because those are the two Supreme

13  Court cases where it originated.  In *Meyer,* the Supreme Court recognized the right of

14  parents to "establish a home and bring up children" and "to control the education of

15  their own."  262 U.S. at 399–401.  *Pierce* recognized that the "liberty of parents and

16  guardians" includes the right "to direct the upbringing and education of children

17  under their control."  268 U.S. at 534–35.  This right has further been expanded to

18  include the right to make decisions about the physical custody of the child, *Stanley v.*

19  *Illinois,* 405 U.S. 645, 651 (1972), as well as the extent of education a child receives,

20  *Wisconsin v. Yoder,* 406 U.S. 205, 213–14 (1972).  *See Regino,* 133 F.4th at 966

21  (collecting cases).

22       Although broad, parental rights are not without limitations.  For instance, in the

23  context of schooling, the state "as *parens patriae*" may restrict parents' interest in

24  custody, care and nurture of their children "by requiring school attendance, regulating

25  or prohibiting the child's labor, and in many other ways."  *Prince v. Massachusetts,* 321

26  U.S. 158, 166 (1944).  Even the scope of *Pierce* has been greatly cabined and is now

27

28

[5] *But see, contra, Parents United for Better Schs., Inc v. Sch. Dist. Of Philadelphia Bd. of Educ.*, 148 F.3d 260 (3d. Cir. 1998) (upholding school district's consensual condom distribution program).

1  understood to stand for the proposition that a state "may not pre-empt the

2  educational process by requiring children to attend public schools." *Norwood v.*

3  *Harrison,* 413 U.S. 455, 461–62 (1973); *see also Yoder,* 406 U.S. at 239 (1972) (White,

4  J., concurring) (stating that the *Pierce* right "lends no support to the contention that

5  parents may replace state educational requirements with their own idiosyncratic views

6  of what knowledge a child needs to be a productive and happy member of society[ ]").

7      Significantly, in the context of discussing sexuality in schools, the Ninth Circuit

8  has held that the "right to limit what public schools or other state actors may tell their

9  children regarding sexual matters, is not encompassed within the *Meyer–Pierce* right

10  to control their children's upbringing and education." *Fields v. Palmdale Sch. Dist.*,

11  427 F.3d 1197, 1207 (9th Cir. 2005), *amended on denial of rehearing,* 447 F.3d 1187

12  (9th Cir. 2006).  And in *Parents for Privacy v. Barr,* the Ninth Circuit rejected attempts to

13  create a "parental right to determine whether and when their children will have to risk

14  being exposed to opposite sex nudity at school" when parents challenged a school's

15  Student Safety Plan for transgender students to use the bathroom and locker room

16  reflecting their gender identity.  949 F.3d 1210, 1232–33 (9th Cir. 2020).

17      As these precedents illustrate, while there may be broad language in earlier

18  decisions such as *Meyer and Pierce*, such dicta must be understood in the context of

19  modern Supreme Court jurisprudence that "has repeatedly rejected broad

20  formulations of asserted fundamental rights, in favor of being 'more precise.'" *Regino*,

21  133 F.4th at 964 (quoting *Glucksberg*, 521 U.S. at 723).  Asserting a broad-based right

22  to make "important decisions" in a child's life is counter to the Ninth Circuit's

23  instruction to "eschew sweeping generalizations, and instead 'adopt a narrow

24  definition of the interest at stake.'" *Regino*, 133 F.4th at 964 (quoting *Raich v.*

25  *Gonzales*, 500 F.3d 850, 863 (9th Cir. 2007)).

26      Examining how courts have articulated the alleged fundamental right in other

27  cases illustrates the proper approach.  As the Ninth Circuit noted in *Regino*, in *Reno*,

28  the Supreme Court considered the rights of undocumented children detained by

19

1   immigration authorities, who under the policy at issue in that case could only be

2   released to parents, close relatives, or legal guardians.  507 U.S. at 297.  The Court

3   rejected the articulation of the substantive due process right as being "freedom from

4   physical restraint" but rather articulated the right as that "of a child who has no

5   available parent, close relative, or legal guardian, and for whom the government is

6   responsible, to be placed in the custody of a willing-and-able private custodian rather

7   than of a government-operated or government-selected child-care institution."  *Id*. at

8   302.

9          Closer to the case at hand is *Parents for Privacy*, in which the court addressed a

10  school policy that permitted transgender students to use the bathroom

11  corresponding to their gender identity rather than their sex assigned at birth.  949

12  F.3d at 1218–19.  Parents who opposed the policy brought a suit alleging, among

13  other substantive due process rights, the right "to direct the education and

14  upbringing of one's children."  *Id*. at 1217.  In articulating the right at issue, however,

15  the Ninth Circuit framed it as the right to "determine whether and when their children

16  will have to risk being exposed to opposite sex nudity at school" and "whether their

17  children, while at school, will have to risk exposing their own undressed or partially

18  unclothed bodies to members of the opposite sex" in "intimate, vulnerable settings

19  like restrooms, locker rooms and showers." *Id*. at 1233.  In so doing, the Ninth Circuit

20  expressly held that "the fundamental right to control the upbringing of one's children

21  does not extend so far as Plaintiffs' hypothesize."  *Id*.  Likewise, this Court concludes

22  that the formulation of the right as the ability to "make important decisions in a child's

23  life" is insufficiently narrow.  Rather, Plaintiff would have this court "define the relevant

24  liberty interest at the very highest level of generality," *Khachatryan*, 4 F.4th at 857,

25  which is inconsistent with the Supreme Court's directive in *Glucksberg*.

26         In any event, even if sufficiently articulated, such a broad formulation of the

27  right is not supported by history and tradition.  The Ninth Circuit has endorsed the

28  view that the *Meyer-Pierce* line of cases can be understood to mean that "[w]hile

20

1   parents may have a fundamental right to decide <u>whether</u> to send their child to a

2   public school, they do not have a fundamental right generally to direct <u>how</u> a public

3   school teaches their child." *Fields*, 427 F.3d at 1206 (citing *Blau v. Fort Thomas Pub.*

4   *Sch. Dist.*, 401 F.3d 381, 395–96 (6th Cir. 2005)).  And as in *Parents for Privacy*, Plaintiff

5   here "fail[s] to cite any Supreme Court authority showing that parents' substantive due

6   process rights under the Fourteenth Amendment encompass a right to direct the

7   curriculum, administration, or policies of public schools" generally.  949 F.3d at 1232.

8   Indeed, in *Parents for Privacy* the Ninth Circuit further emphasized that "parents not

9   only lack a constitutional right to direct the curriculum that is taught to their children,

10  but that they also lack constitutionally protected rights to direct school administration

11  more generally." *Id.*

12      In many circumstances, courts have upheld state actions that "intrude upon the

13  liberty interest of parents in controlling the upbringing and education of their

14  children." *Fields,* 427 F.3d at 1204.  Of particular note, whatever fundamental rights

15  parents have to make decisions concerning the care, custody, and control of their

16  children, in the school context that right does not extend to providing consent before

17  children are exposed to opposite-sex nudity at school, *Parents for Privacy*, 949 F.3d at

18  1233, asked about sexual topics in elementary school, *Fields*, 427 F.3d at 1200, given

19  condoms in public school, *Parents United for Better Schools, Inc.,* 148 F.3d at 275; *see*

20  *also Curtis v. School Committee of Falmouth*, 652 N.E.2d 580 (Mass. 1995), provided

21  education in sexuality and health, *Leebaert v. Harrington*, 332 F.3d 134 (2d Cir. 2003),

22  or required to attend a compulsory high school assembly educating them on AIDS

23  and other health concerns in which sexuality is expressly discussed, *Brown v. Hot,*

24  *Sexy, and Safer Prods.*, 68 F.3d 525, 529 (1st Cir. 1995), *abrogated on other grounds*

25  *by DePoutot v. Raffaelly,* 424 F.3d 112, 118 n.4 (2005)  It is simply not the case that a

26  history to make important decisions on behalf of children is "objectively, deeply

27  rooted in this Nation's history and tradition," *Glucksberg*, 521 U.S. at 720–21, given the

28

1  myriad ways in which schools educate children in matters concerning gender and
2  sexuality.

3      Additionally, it is important to note that the Policy here does not allow state
4  actors to replace the parent as the "decision-maker" for the child's best interests.
5  Rather, it is the <u>student</u> that makes decisions about their names and pronouns.
6  Although Plaintiff argues that by acquiescing to the students' wishes the school is
7  taking an affirmative step to enforce their identity, the school – at no point – has the
8  ability to direct a student to use a different name or pronouns in how they refer to
9  themselves.  This further distinguishes the instant case from those in which laws were
10 found to have violated parental rights by replacing the parent with a state actor.  *See*
11 *City of Huntington Beach,* 790 F. Supp. 3d at 832 (collecting cases).

12     Accordingly, the Defendant's Policy does not violate a parent's right to make
13 important decisions on behalf of their children, either facially or as applied.

14          **3.  The Right to Maintain the Integrity of the Family**

15     Plaintiff next argues that the Defendant's Policy violates a right to "family
16 integrity."  According to Plaintiff, by "authorizing the District to socially transition Ms.
17 Regino's children without her consent, the Policy threatens to fundamentally alter the
18 nature of her 'familial bond' with them."  (Opp'n at 11.)  In support of her argument
19 that there is a substantive due process right to family integrity, Plaintiff cites to *Marsh*
20 *v. County of San Diego*, 680 F.3d 1148 (9th Cir. 2012), *Kelson v. City of Springfield*,
21 767 F.2d 651 (9th Cir. 1987), *overruled on other grounds by Daniels v. Williams,* 474
22 U.S. 327, 328 (1986), and *Smith v. City of Fontana*, 818 F.2d 1411 (9th Cir. 1987),
23 *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir.
24 1999).  However, to state the facts of these cases is to distinguish them.

25     In *Kelson*, parents brought an action under 42 U.S.C. § 1983 after their son
26 committed suicide while at school.  767 F.2d at 653.  The Ninth Circuit concluded the
27 parents had stated a claim for relief, holding that "a parent has a constitutionally
28 protected liberty interest in the companionship and society of his or her child."  *Id*. at

1   655.  In so holding, the Ninth Circuit relied on Supreme Court decisions concluding

2   that an indigent defendant in a paternity proceeding brought by the State has a right

3   to receive blood work to establish parentage, *see Little v. Streater*, 451 U.S. 1 (1981),

4   and that parents have a right to due process during proceedings to terminate their

5   parental rights, *see Lassiter v. Department of Social Services*, 452 U.S. 18 (1981) and

6   *Santosky v. Kramer*, 455 U.S. 745 (1982).  In those decisions, the Supreme Court

7   observed that "a parent's desire for and right to the companionship, care, custody and

8   management of his or her children is an important interest that undeniably warrants

9   deference and, absent a powerful countervailing interest, protection." *Lassiter*, 452

10  U.S. at 27 (cleaned up).

11      The Ninth Circuit in *Kelson* also relied on a Ninth Circuit decision, *Morrison v.

12  Jones*, 607 F.2d 1269 (1979), *cert. denied,* 445 U.S. 962 (1980), in which the Court

13  found the parents had alleged the violation of a substantive due process right when

14  "county officials transported the California plaintiff's son, a German alien and ward of

15  the state, to Germany on the grounds that the plaintiff was incapable of providing the

16  special care which her mentally ill son required." *Kelson*, 767 F.2d at 654 (citing

17  *Morrison,* 607 F.2d at 1275).  In so holding, the *Morrison* Court described the nature

18  of the right as "the integrity of the family unit", *Morrison*, 607 F.2d at 1275–76, which

19  appears to be the source of the language that Plaintiff points to in support of finding

20  the violation of a substantive due process right in this case.

21      Two of the other cases cited by Plaintiff, *Smith* and *Lee*, also involve substantial

22  interference in the ability of a parent and child to maintain their familial relationship.

23  In *Smith*, the Court concluded that just as a parent had a substantive due process right

24  to companionship with a parent, so too did a child have such a right.  818 F.2d at 1418

25  ("The companionship and nurturing interests of parent and child in maintaining a tight

26  familial bond are reciprocal, and we see no reason to accord less constitutional value

27  to the child-parent relationship than we accord to the parent-child relationship.")

28  Accordingly, the Court concluded that a child whose father was shot and killed by

1    police in the course of an arrest could maintain a cause of action under the Fourteenth

2    Amendment.  *Id.* at 1420.  And in *Lee*, the Ninth Circuit concluded that a parent's

3    fundamental right of companionship and society of a child, coupled with the First

4    Amendment protection of family relationships, were implicated where state officials

5    confused plaintiff's mentally disabled son for another individual and extradited him

6    from California to New York, where he spent two years in prison.  250 F.3d at 676,

7    685–86.

8          Thus, while Plaintiff is correct that there is a substantive due process right to

9    maintain family integrity, that right is implicated where state officials separate a parent

10   and child either through death or for a substantial length of time.  None of the cases

11   cited by Plaintiff come remotely close to extending that right to the names or

12   pronouns used by a school district.  There is no allegation that the Defendant's Policy,

13   either facially or as applied, deprived Plaintiff from the companionship of her child.  At

14   most, the SAC includes an allegation that after A.S. told the counselor that she

15   "wanted to tell her mother about her new male identity," "the counselor was not

16   supportive of this course of action [and] brushed off A.S.'s request and told her that if

17   she wanted to 'come out' to her family, she should notify other family members first."

18   (SAC ¶ 69.)  Even in the light most favorable to the Plaintiff, this allegation does not

19   demonstrate the level of interference by state actors present in the cases on which

20   Plaintiff relies.  While Plaintiff may be able to cherry-pick language from these cases

21   that discuss the right to maintain the integrity of her family or the familial bond, these

22   cases and the Supreme Court decisions on which they ultimately rely are properly

23   understood as protecting against the state physically separating a parent and child or

24   terminating the legal relationship between them.  That right is simply not implicated in

25   this case.

26          Finally, *Marsh v. County of San Diego* is even farther afield.  While the Ninth

27   Circuit in that case relied on the "well-established substantive due process right to

28   family integrity," 680 F.3d at 1154, it narrowly defined the right in that case to be "a

1    parent's right to control the physical remains, memory and images of a deceased child

2    against unwarranted public exploitation by the government." *Id*.  If anything, *Marsh*

3    indicates that the right to family integrity should not be used to justify the broad-

4    based right suggested by Plaintiff but rather reinforces the need to describe new

5    fundamental rights in a "most circumscribed manner." *Regino*, 133 F.4th at 960

6    (quoting *Khachatryan*, 4 F.4th at 856).

7          For these reasons, the Court concludes that Defendant's Policy does not violate

8    a parent's right to family integrity.

9                              **4.  The Right to Name Children**

10         Plaintiff briefly argues that she has a constitutional right to name her children.

11    Assuming that such a right exists, however, it is not implicated in this case.  There is no

12    argument that, on the face of the policy or as applied, that Defendants have interfered

13    with Plaintiff's right to name her children.  Under the Defendant's Policy, while the

14    school may refer to a student by a different name, the student's legal name remains

15    unchanged unless supported by proper documentation.  (Policy at 7.)

16         As the cases cited by Plaintiff indicate, while the school may <u>refer</u> to a student

17    by a name other than the student's legal name, that does not implicate a substantive

18    due process right to <u>name</u> a child.  For example, in *Sydney v. Pingree*, 564 F. Supp.

19    412 (S.D. Fla. 1982), the court held that parents had a substantive due process to

20    choose a legal name for their child, and that a statute requiring parents to give a child

21    born in wedlock the father's surname was unconstitutional.  Indeed, most of the cases

22    cited by Plaintiff involve a parents' right to choose the surname of their children that

23    would appear on the child's birth certificate.  *See O'Brien v. Tilson*, 523 F. Supp. 494

24    (E.D. N.C. 1981); *Jech v. Burch*, 466 F. Supp. 714 (D. Haw. 1979).  That right is not, of

25    course, implicated in this case.

26         And as Plaintiff impliedly acknowledges, even the right to choose a child's legal

27    name is not without limits.  In *Henne v. Wright*, 904 F.2d 1208 (8th Cir. 1990), three

28    parents challenged a Nebraska statute that required a child's surname to be that of a

1  married woman's husband, the surname or maiden surname of the mother, or a

2  hyphenated name of both parents. *Id*. at 1213 n. 5. In assessing the asserted

3  fundamental right at issue, the Court characterized it as the "right to give a child a

4  surname at birth with which the child has no legally established parental connection."

5  *Id*. at 1213. After discussing many of the cases cited throughout Plaintiff's brief, the

6  court held there was no such due process right. As the court noted, "[w]hile *Meyer*

7  and *Pierce* extended constitutional protection to parental decisions relating to child

8  rearing, the parental rights recognized in those cases centered primarily around the

9  training and education of children." *Id*. at 1214. Recognizing a right to choose a

10  surname without a legally established parental connection was an extension of *Meyer*

11  and *Pierce*, the court concluded that such extension "has to be grounded in the

12  tradition and history of this nation." *Id*. Finding no support for the right articulated by

13  the parents, the Court declined to apply strict scrutiny to the Nebraska law, and

14  upheld it on rational basis review. *Id*. at 1215.

15      In short, while there may be a limited fundamental right to choose a child's

16  legal name, Plaintiff has pointed to no authority that a school may not use a different

17  name at that child's request without parental approval. Without seeking to trivialize

18  Plaintiff's understandable interest over her child's professed desire to go by a different

19  gender, the Court observes that Plaintiff does not explain how her legal theory would

20  not apply to the everyday situation where a school official refers to a child by a

21  nickname or other moniker than their legal name.

22      In sum, the Defendant's Policy does not violate a substantive due process right

23  to choose a child's name, and Plaintiff has offered no support for the proposition that

24  any such right should be extended to calling a child by a name other than their legal

25  name.

26          **5. Alternative Right to Notice**

27      Alternatively, Plaintiff alleges that "public schools may not socially transition

28  children upon their request. . .without providing parental notice." (SAC ¶ 4.) The

1    SAC defines "notice" as "(1) being notified or (2) in the alternative, having the ability to

2    obtain truthful information." (*Id.* ¶ 95 n. 5.) According to Plaintiff, the right to notice

3    "flows from the well-established right of parents to (1) direct and control their

4    children's healthcare treatment; (2) make important decisions in the lives of their

5    children, and (3) make private familial decisions regarding their children without

6    undue interference by the state." (*Id.* ¶ 120.) Plaintiff alleges that "[i]f the student

7    does not authorize parental notification, the Policy requires that the transition be

8    concealed from the student's parents, except when disclosure is either "required by

9    law" or "compelling evidence" exists that disclosure is "necessary" for the student's

10   "well-being." (Opp'n at 4.) Moreover, "[t]he prohibition on parental notification has

11   no exception for when parents ask District personnel whether their child is being

12   socially transitioned." (SAC ¶ 53.)

13        In *City of Huntington Beach*, the district court analyzed the fundamental right to

14   information about their children's gender identity in the context of AB 1955, which

15   included provisions that prohibited school personnel from disclosing information

16   related to a pupil's sexual orientation, gender identity or gender expression to

17   another person without the pupil's consent. 790 F. Supp. 3d at 819. The court

18   considered whether parents have a fundamental right to information about their

19   children's gender identity that, like the case here, imposed an affirmative duty on

20   schools to inform parents of their children's gender identity. *Id.* at 834. There, the

21   court reasoned that although courts have recognized a parental right to notice and

22   consent of medical examinations of their children, such a right was not implicated

23   because the plaintiffs failed to allege conduct considered to be medical treatment. *Id*.

24   So is the case here. For the reasons described above, the Court rejects Plaintiff's

25   argument that healthcare treatment is at issue such that a fundamental parental right

26   to be notified follows.

27        However, as the *Huntington Beach* court acknowledged, even where medical

28   treatment is not at issue, "parents may nonetheless have a right to information about

27

1   their child's gender identity or social transition efforts because such knowledge affects

2   their right to direct the upbringing of their children." *Id.* Nevertheless, the court

3   rejected finding such a fundamental right, in part because "constitutional parental

4   rights are not so broad as to impose an affirmative duty on third parties to inform

5   parents of their children's actions, where those actions are done voluntarily and not

6   initiated by the third party." *Id.* at 835–36.

7        The Court finds this reasoning persuasive. *See id.* at 834–36. Here, Plaintiff is

8   asserting a fundamental right to have schools notify them prior to calling their children

9   by a new name and/or pronouns or requiring others to call their child by a new name

10  and/or pronouns upon request by the child. (SAC ¶ 97.) As previously discussed,

11  parental rights are not without limitation. Especially relevant here are the Ninth

12  Circuit's holdings that parents "lack constitutionally protected rights to direct school

13  administration more generally", *Parents for Privacy,* 949 F.3d at 1231, and that "the

14  right to limit what public schools or other state actors may tell their children regarding

15  sexual matters, is not encompassed within the *Meyer-Pierce* right to control their

16  children's upbringing and education", *Fields,* 427 F.3d at 1207. Moreover, the

17  Supreme Court has stated that the Due Process Clause, "cannot fairly be extended to

18  impose an affirmative obligation on the State to ensure that those interests do not

19  come to harm through other means." *DeShaney v. Winnebago County Dep't of Soc.*

20  *Servs.,* 489 U.S. 189, 195 (1989). Considering these cases together, Plaintiff has not

21  established a fundamental parental right to notice prior to the school using a different

22  name or pronouns to refer to a student nor have they established that such a right is

23  encompassed within a recognized fundamental right.

24       The Court turns next to Plaintiff's conception of the right to notice as "having

25  the ability to obtain truthful information." (SAC ¶ 95 n.5.) The First Circuit's analysis in

26  *Foote* is instructive on this issue. There, the court rejected the argument that a

27  school's nondisclosure protocol, which provided that "parents are not to be informed

28  of their child's transgender status and gender-affirming social transition to a

1   discordant gender identity unless the child, of any age, consents[,]" restricted the

2   parental right to direct their child's upbringing by deceiving them and deprived them

3   of information about the child. *Foote,* 128 F.4th at 352.  On the "deception" issue, the

4   court noted that the plaintiffs' allegations did not plausibly illustrate any affirmative

5   misrepresentation made by the school. *Id.*  Here, the SAC provides general

6   allegations that the Policy would require the school to deceive parents because there

7   is "no exception for the situation where parents directly ask District personnel whether

8   their child is being socially transitioned." (SAC ¶ 53.)  However, the language of the

9   Policy does not plausibly support such an inference of affirmative misrepresentation.

10  Rather the Policy states that ". . .the district shall only disclose the information to others

11  with the student's prior written consent, except when the disclosure is otherwise

12  required by law or when the district has compelling evidence that disclosure is

13  necessary to preserve the student's physical or mental well-being."  Further, there are

14  no allegations that school personnel deceived Plaintiff in response to any direct

15  questioning that would give rise to an as-applied challenge.  Accordingly, Plaintiff has

16  failed to establish a fundamental parental right to notice under either of her provided

17  definitions.

18                    *        *        *        *        *

19          To summarize, each of the theories of substantive due process articulated by

20  Plaintiff either do not find support in this nation's history and traditions, or do not

21  extend to prohibit schools from utilizing a student's preferred name and pronouns.

22  Accordingly, Defendant's policy is subject to rational basis review.

23          **C.  Rational Basis Review**

24          Turning to rational basis review, to satisfy this low bar the provisions must be

25  "rationally related to a legitimate state interest." *Fields,* 427 F.3d 1208.  Here, the state

26  asserts a "legitimate state interest to protect student privacy and create a zone of

27  protection from potential domestic abuse." (Mot. at 27, citing *Sterling v. Borough of*

28  *Minersville*, 232 F.3d 190,193–97 (3d Cir. 2000) and *Mueller v. Auker*, 700 F.3d 1180,

1186–87 (9th Cir. 2012)).  As the cited cases illustrate, these are legitimate state
interests.  Moreover, the Defendant's Policy is rationally related to them.  Declining to
inform a parent about a student's desire to use a different name or pronouns at school
by definition protects a student's privacy.  And while the Court has no reason to doubt
Plaintiff's assertion that she is supportive of her children (SAC ¶ 2) and there is no
indication of potential abuse, that is sadly not true in all families, and the school could
reasonably conclude that some students might be placed in danger if their parents
were informed they had requested to be called by a different name or pronouns than
that which reflected their sex at birth.  As Defendant's Policy survives rational basis
review, Plaintiff's claim alleging a violation of substantive due process fails.

## II.    Procedural Due Process Claims

Plaintiff also brings as-applied and facial procedural due process claims.  "The
requirements of procedural due process apply only to the deprivation of interests
encompassed by the Fourteenth Amendment's protection of liberty and property."
*K.W. ex rel. D.W. v. Armstrong,* 789 F.3d 962, 972 (9th Cir. 2015) (quoting *Bd. of
Regents of State Colls. v. Roth,* 408 U.S. 564, 569 (1972)).  To state a viable claim,
Plaintiff must first allege that she "has been deprived of a protected interest in
property or liberty."  *Regino,* 133 F.4th at 966 (citing *Am. Mfrs.,* 526 U.S. at 59 and U.S.
Const. Amend. XIV, § 1).  If she does adequately allege such a deprivation, the next
question is "whether the procedure attendant upon that deprivation were
constitutionally sufficient."  *Id.* (citing *Am. Civ. Liberties Union of Nev. v. Masto,* 670
F.3d 1046, 1058 (9th Cir. 2012).  In its decision on appeal, the Ninth Circuit explained
that Plaintiff need not allege a fundamental right to state a claim for procedural due
process violations.  *Id.* at 967.  "This is because the procedural component of the Due
Process Clause protects more than just fundamental rights."  *Id.* (cleaned up).  Instead,
"procedural due process protects all liberty interests that are derived from state law or
from the Due Process Clause itself."  *Id.* (cleaned up).

1        Plaintiff contends that by socially transitioning her children without consent, the

2   Policy infringes on her constitutionally protected liberty interests and fails to provide

3   her without adequate procedural safeguards.  (SAC ¶ 142.)  She specifically notes the

4   lack of an opportunity to receive notice and an opportunity to be heard by a judicial

5   officer prior to the social transition of her children, a thorough investigation of the

6   relevant facts, and notice after her children are socially transitioned.  (*Id.* ¶ 143.)

7        As an initial matter, Plaintiff has not plausibly alleged the deprivation of a liberty

8   interest.  For the reasons discussed above, there is no identifiable fundamental right at

9   issue here.  However, as the Ninth Circuit explained, the failure to identify a

10  fundamental right does not end the inquiry into whether a liberty interest is at stake.

11  But the SAC does not point to any other state law or Due Process right that might

12  serve as a basis for a protected liberty interest.  Without any such argument, the Court

13  cannot assess whether a procedural due process right exists.  Instead, the procedural

14  due process claims appear to be premised solely on the existence of a fundamental

15  parental right.  *See Mead v. Public Schl District,* 800 F. Supp. 3d. 836, 851 (W.D. Mich.

16  2025) (declining to dismiss a procedural due process claim where the plaintiff had

17  alleged a deprivation of a liberty interest).

18       Moreover, even if an interest had been identified, both parties agree that where

19  a deprivation of a protected interest derives from a legislative act, a person is not

20  entitled to procedural due process beyond the government's compliance with the

21  standard legislative process.  (Mot. Dismiss at 30; Opp'n at 24.)  Here, the Policy was

22  created based on a sample anti-harassment and anti-discrimination policy from the

23  California School Boards Association.  (Mot. Dismiss at 11.)  The CSBA received

24  guidance from the California Department of Education, who issued guidance pursuant

25  to its authority under California Education Code § 33308.5.  (*Id.* at 10.)  Plaintiff does

26  not disagree that the Policy is a legislative act.

27        Rather, Plaintiff contends that because the Policy creates an adjudicatory

28  procedure governing case-by-case determinations that can result in the deprivation of

1    liberty interests, procedural due process entitlements exist when questions of fact are

2    determined. (Opp'n at 24.)  Plaintiff considers the Policy to be adjudicative because it

3    requires school personnel to determine (1) whether the child's request is being made

4    for an "improper purpose" and (2) if the child wants the social transition to occur in

5    secret from his or her parents, whether there is "compelling evidence" that parental

6    disclosure is necessary for the child's well-being. (*Id.*)  Defendants argue that this

7    argument fails as well because any actions taken by the Policy are against a student,

8    rather than a parent. (Reply at 14.)

9          The Policy provides students with certain rights as it pertains to the use of the

10   students preferred name and/or pronouns. (*See* Policy at 5.)  As such, any "adverse"

11   action would be taken against the student seeking to have school personnel use their

12   preferred name and pronouns.  As Defendants point out, a district may deny a student

13   the first right of being addressed by their preferred name and/or pronouns if the

14   district determines that the request was made for an improper purpose and/or may

15   deny non-disclosure where it appears that (1) disclosure is required by law or (2)

16   compelling evidence establishes disclosure is necessary for the physical or mental

17   well-being of the student. (*Id.* at 5-6.)  Thus, even if a liberty interest had been

18   identified, the Court concludes that it is not an adjudicatory action against the parent.

19   Thus, Plaintiff's facial challenge based on procedural due process fails.  Moreover, as

20   the Plaintiff has not alleged any deviation from the Policy, her as applied claim fails as

21   well.

22   **III.    Leave to Amend**

23         Requests for leave to amend should be granted with "extreme

24   liberality."  *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir.

25   2020) (quoting *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 972 (9th Cir. 2009) (citation

26   omitted)).  When considering whether to grant leave to amend, a district court should

27   consider several factors including undue delay, the movant's bad faith or dilatory

28   motive, repeated failure to cure deficiencies by amendments previously allowed,

undue prejudice to the opposing party, and futility. *Id.* (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Of the *Foman* factors, prejudice to the opposing party carries the most weight. *Id.* (citing *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003)). Absent prejudice, or a strong showing of any of the remaining *Foman* factors, there exists a <u>presumption</u> under Rule 15(a) in favor of granting leave to amend. *Eminence Capital, LLC*, 316 F.3d at 1052 (citing *Lowrey v. Texas A & M Univ. Sys.*, 117 F.3d 242, 245 (5th Cir. 1997)). However, "[t]he district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990) (quoting *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989)).

　　　　With this in mind, the Court nevertheless finds that further amendment would be futile. Plaintiff has had the opportunity to submit multiple amended complaints – and still has not provided sufficiently alleged her claims. Further, Plaintiff has received Ninth Circuit guidance as to what she needed to do to state her causes of actions and has not done so. Given that many of the conclusions drawn here are largely legal, there is no indication that further factual development would allow Plaintiff's claims to succeed. Thus, leave to amend is DENIED.

## CONCLUSION

　　　　For the reasons discussed above the Court GRANTS Defendant's Motion to Dismiss (ECF No. 88).

　　　　IT IS SO ORDERED.

Dated: 　**January 15, 2026**　

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE